**PENT–R–BOOKS, INC., et al., Plaintiffs,**
**v.**
**UNITED STATES POSTAL SERVICE**
**and the United States of America,**
**Defendants.**
**No. 71–C–183.**

United States District Court,
E. D. New York.

June 10, 1971.

---

**1.** The Supreme Court has not passed on this specific point. See Wade v. Wilson, 396 U.S. 282, 286, 90 S.Ct. 501, 24 L.Ed. 2d 470 (1970).

Schwartz, Schindler & Levy, by Herbert Monte Levy, New York City, for plaintiffs.

David A. Nelson, General Counsel, United States Postal Service, Washington, D. C., Edward R. Neaher, U. S. Atty., E.D.N.Y., by James D. Porter, Jr., Asst. U. S. Atty., Brooklyn, N. Y., for defendants.

Irwin Karp, New York City, amicus curiae for Author's League of America, Inc.

Before KAUFMAN, Circuit Judge, and MISHLER and JUDD, District Judges.

## MEMORANDUM AND ORDER

JUDD, District Judge.

This action for an injunction against enforcement of a federal statute presents the knotty problem of federal power to regulate pornography and near-pornography, and specifically the validity of requirements set forth in the so-called Goldwater amendment to the Postal Reorganization Act of 1970 (39 U.S. C. §§ 3010–11; 18 U.S.C. §§ 1735–37; Pub.L. 91–375), and regulations issued thereunder.

The statute imposes two major duties on mailers of "sexually oriented advertisements." The first is that they must purchase from the Postal Service a monthly list of persons who have informed the Service in writing that they do not want to receive sexually oriented advertisements, and then remove the names of these persons from their mailing lists. The second duty is that they must place on the envelope or cover of the advertisements a "mark or notice" to be prescribed by the Postal Service.

## The Posture of the Case

The action was begun by the filing of a complaint and a simultaneous application for a temporary restraining order and for the convening of a three-judge court. Such a court was convened on a finding by the district judge that the action raised substantial questions of the constitutionality of an act of Congress. 28 U.S.C. § 2282. The request for a temporary restraining order was denied.

Prior to the hearing before the three-judge court, both sides submitted voluminous affidavits and memoranda. At the hearing, it appeared that there were no substantial issues of material fact, and that no testimony was required, but that the issues of law would require thoughtful consideration. During the presentation of the case to the three-judge court, both parties made oral motions for summary judgment.

Subsequent to the hearing, the three-judge court, noting that there were substantial questions which would require consideration, issued a limited temporary injunction enjoining the enforcement of the statute and regulations (a) insofar as they required use of the Postal Service list by persons who mail sexually oriented advertisements only in response to specific requests therefor, and (b) insofar as they required that mailers who place the legend "Sexually Oriented Ad" on a sealed inner envelope or cover must also place such a legend on the outer envelope or cover.

## The Facts

The plaintiffs in this case cover a wide variety of participants in the distribution of sexually oriented materials. Plaintiff Pent-R-Books, Inc., is the publisher of "The Photographic Manual of Sexual Intercourse." Plaintiff Complete Offset Lithography, Inc. prints, reproduces and manufactures mail matter which may constitute sexually oriented advertisements. Plaintiffs Educational Books, Inc., Fact Research, Inc., Medi-Data, Inc., Book Bargains, Inc., RAS Enterprises, Inc. and Unique Distributors, Inc., are publishers or distributors of books, magazines, pamphlets and motion picture films, for sale only to adults. Plaintiff Electronic Innovations, Inc. is planning to distribute and advertise films, phonograph records, cassettes, etc., for sale to adults. Plaintiff Fact Records, Inc. is planning the sale and advertisement of tourist guides as to sexual practices and activities in varying countries, for adults only.

Plaintiff R & R Computer Lists, Inc., is a broker of mailing lists, which prepares mailing lists and leases them for use by others for advertising purposes. Plaintiff RAS Enterprises, Inc., owns and maintains mailing lists and processes the mailing of advertisements and shipment of materials for the plaintiffs who are publishers or distributors. Plaintiff Ronald A. Stewart (who may be the RAS in RAS Enterprises, Inc.) is an individual who, according to the complaint, has been described in pending federal criminal actions as the *alter ego* of RAS Enterprises, Inc. and Pent-R-Books, Inc.

Plaintiff Moe Shapiro is an unaffiliated small dealer in sexually oriented material, who sends his advertisements only in response to written requests, elicited by advertisements in periodicals or newspapers. His gross profit from the activity is less than $10,000. One of his typical advertisements says:

> Over 100 UNCENSORED PICTURES of Coital Positions in FREE BONUS BOOK! Send $1 cash or stamps . . . (deductible) for one ILLUSTRATED BROCHURE! Give Age; Sign name.

Advertisements by Pent-R-Books, Inc. are issued in large volume. Over a period of a year and a half, it has mailed advertisements of the Photographic Manual to approximately three million people on its own mailing list and five and one-half million people on mailing lists rented from others. As a result of these advertisements and of wide-spread bookstore sales, approximately 300,000 hard-cover copies of the Photographic Manual were sold at prices ranging from approximately $10.00 to $13.00 a copy,

and approximately 100,000 paperback copies at about $3.00 a copy.

Between 100,000 and 150,000 prohibitory orders were sent to Pent-R-Books, Inc., by the Post Office Department, as a result of notices sent to the Department under 39 U.S.C. § 4009 (now § 3008). That statute provides that the Postal Service on request of any person "shall issue an order * * * directing the sender * * * to refrain from further mailings to the named addressees." In approximately 468 cases there were in fact second mailings to persons who were named in prohibitory orders, and administrative hearings have been held in the Post Office Department [1] on these cases. Affidavits by plaintiff indicate that computer errors may cause mailings to persons on the Postal Service list in approximately one-half of one percent of the cases. This discrepancy results from a number of circumstances difficult to control: differences in the spelling of the name on the mailer's list and on the Postal Service list, variances in addresses, and even dust accumulating on either party's tape. The mailing list of Pent-R-Books, Inc. is on tape, which is periodically "cleansed" by removing the names of persons who are listed in prohibitory orders.

Copies of the Postal Service list will be made available either by subscription to monthly computer tapes or by purchase of print-outs. The print-outs, price at ½ cent per page in the revised regulations, will presumably be used by small mailers, and the computer tape by large mailers whose own lists are already on tape. Subscribers to the Postal Service list are required to deposit $5,000 each per year, to be credited against a maximum of $10,000 a year, depending on how many subscribers there will be. This price is based on a Post Office estimate that there will be about 25 subscribers to share the cost. The Postal Service estimates that 1,000,000 names will be placed on the list in the first year, and at least 200,000 annually thereafter. The regulation provides for the total net cost of preparing and distributing the list to be prorated among the subscribers.

The cost of processing mailing lists in order to comply with the Goldwater amendment was the subject of affidavits by computer experts for plaintiffs and defendants. The first Postal Service list of persons who asked to be kept free from sexually oriented advertisements contained about 6,800 names; the fourth monthly list, issued May 10, 1971, contains 155,266 names. The cost of cleansing a mailing list depends more on the size of the mailing list than on the number of names to be eliminated, since all the reels in the mailing list must be run through the computer to remove names on the Post Office list. Plaintiffs estimate the cost of cleansing their list at $26,000 a year (including a $10,000 fee to the Postal Service). Defendants' estimate is about $20,000 a year. The court finds that $25,000 a year is a fair estimate.

The original Postal Service regulations required that the words "Sexually Oriented Ad" be printed in large type on the outside of every envelope. That the use of this legend may have affected mailers adversely was evidenced by protests from individuals who wished to receive such advertisements discreetly and also by a substantial decline in sales. The secretary of Pent-R-Books, Inc. and RAS Enterprises, Inc., reports that many recipients of sexually oriented advertisements asked to be taken off the mailing lists when the legend required by the Postal Service regulation was used on the outer envelope. Typical comments include:

[I]t is a source of embarrassment to get envelopes like this handed to you.

In the future, please send any advertisement in a "Plain Envelope." You

---

1. The Postal Service is mentioned in the statute, although it will not take over the operation of the Post Office Department until July 1, 1971. The court treats the two designations as interchangeable for present purposes.

do not have to warn me of the contents. I welcome it. I live with my mother and "Old-Maid" sister.

Had I had a P. O. Box number it would be different, but most everyone hands me my mail since I live in a rooming-house.

Do not send material if you mark your envelopes "sexually oriented ad," as my mail is handled by doormen and servants.

Mailings which were sent in envelopes containing the legend required by the Postal Service reflected a substantial drop in the number of favorable responses, with a serious loss of sales to the plaintiffs.

The operations manager of the computer house used by plaintiff RAS Enterprises, Inc. analyzed the 31,604 names on the second Postal Service list and found that 621 of them (or approximately 2%), had previously bought material from one or more of the plaintiffs.

### The Legislative Findings and the Statute

The Congressional findings which support the Goldwater amendment are contained in Section 14 of Pub.L. 91–375, which reads:

#### INVASION OF PRIVACY BY MAILING OF SEXUALLY ORIENTED ADVERTISEMENTS

SEC. 14. (a) The Congress finds—

(1) that the United States mails are being used for the indiscriminate dissemination of advertising matter so designed and so presented as to exploit sexual sensationalism for commercial gain;

(2) that such matter is profoundly shocking and offensive to many persons who receive it, unsolicited, through the mails;

(3) that such use of the mails constitutes a serious threat to the dignity and sanctity of the American home and subjects many persons to an unconscionable and unwarranted intrusion upon their fundamental personal right to privacy;

(4) that such use of the mail reduces the ability of responsible parents to protect their minor children from exposure to material which they as parents believe to be harmful to the normal and healthy ethical, mental, and social development of their children; and

(5) that the traffic in such offensive advertisements is so large that individual citizens will be helpless to protect their privacy or their families without stronger and more effective Federal controls over the mailing of such matter.

(b) On the basis of such findings, the Congress determines that it is contrary to the public policy of the United States for the facilities and services of the United States Postal Service to be used for the distribution of such materials to persons who do not want their privacy invaded in this manner or to persons who wish to protect their minor children from exposure to such material.

The basic statutory provision is contained in 39 U.S.C. § 3010, which reads:

(a) Any person who mails or causes to be mailed any sexually oriented advertisement shall place on the envelope or cover thereof his name and address as the sender thereof and such mark or notice as the Postal Service may prescribe.

(b) Any person, on his own behalf or on the behalf of any of his children who has not attained the age of 19 years and who resides with him or is under his care, custody, or supervision, may file with the Postal Service a statement, in such form and manner as the Postal Service may prescribe, that he desires to receive no sexually oriented advertisements through the mails. The Postal Service shall maintain and keep current, insofar as practicable, a list of the names and addresses of such persons and shall make the list (including

portions thereof or changes therein) available to any person, upon such reasonable terms and conditions as it may prescribe, including the payment of such service charge as it determines to be necessary to defray the cost of compiling and maintaining the list and making it available as provided in this sentence. No person shall mail or cause to be mailed any sexually oriented advertisement to any individual whose name and address has been on the list for more than 30 days.

(c) No person shall sell, lease, lend, exchange, or license the use of, or, except for the purpose expressly authorized by this section, use any mailing list compiled in whole or in part from the list maintained by the Postal Service pursuant to this section.

(d) "Sexually oriented advertisement" means any advertisement that depicts, in actual or simulated form, or explicitly describes, in a predominantly sexual context, human genitalia, any act of natural or unnatural sexual intercourse, any act of sadism or masochism, or any other erotic subject directly related to the foregoing. Material otherwise within the definition of this subsection shall be deemed not to constitute a sexually oriented advertisement if it constitutes only a small and insignificant part of the whole of a single catalog, book, periodical, or other work the remainder of which is not primarily devoted to sexual matters.

Provision for judicial enforcement of this statute is contained in 39 U.S.C. § 3011, which authorizes the Attorney General to commence a civil action in a district court for an injunction on request of the Postal Service. Such an injunction may be issued if the court finds a violation of Section 3010, and may include a direction to any postmaster to refuse to accept sexually oriented advertisements originating from the defendant in the action.

Criminal prosecution for violations of the Goldwater amendment is authorized in 18 U.S.C. §§ 1735 and 1737, which are also part of Pub.L. 91–375, and which read:

§ 1735. Sexually oriented advertisements

(a) Whoever—

(1) willfully uses the mails for the mailing, carriage in the mails, or delivery of any sexually oriented advertisement in violation of section 3010 of title 39, or willfully violates any regulations of the Board of Governors issued under such section; or

(2) sells, leases, rents, lends, exchanges, or licenses the use of, or, except for the purpose expressly authorized by section 3010 of title 39, uses a mailing list maintained by the Board of Governors under such section;

shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first offense, and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for any second or subsequent offense.

Section 1737 imposes similar penalties on anyone who

shall print, reproduce or manufacture any sexually related mail matter, intending or knowing that such matter will be deposited for mailing * * * in violation of section 3008 or 3010 of title 39, or in violation of any regulation of the Postal Service issued under such section. * * *

### The Regulations

Notice of proposed rule-making to implement Section 3010(b) and (c) was originally published in the Federal Register of January 13, 1971, with a request for interested persons to submit written comments by January 20, 1971. After receipt of such comments, revised regulations were published in the Federal Register of January 30, 1971, as

Section 124.9 of Part 124 of the Post Office Department Regulations.

The original regulation implementing 3010(c), forbidding transfers of the Postal Service list, was so broad that plaintiffs feared that it would prevent list brokers from renting a cleansed list to a mailer.

Between the commencement of this action and the hearing before the three-judge court, the Post Office Department issued an interpretive statement (36 Fed. Reg. 4434—March 5, 1971), permitting the transfer or use of purged lists, and specifying:

> The Post Office Department takes the position that the limitations in 39 U.S.C. § 3010(c) as interpreted by § 124.9(d) (2) of the regulations are applicable only to the list published by it and copies or portions thereof, and that a subscriber is not precluded from using the Postal Service's list to purge his privately owned (or controlled) mailing list and thereafter allowing others to obtain or use his privately owned (or controlled) mailing list.

A second objection to the regulations, that the proposed legend on the outer envelope violated the privacy of addressees, was met by an amendment to the regulations published on March 25, 1971, which now permits the legend "Sexually Oriented Ad" to be printed on a sealed inner envelope. 36 Fed.Reg. 56088.

The regulations as a whole were declared invalid by another three-judge court for failure to publish them in the Federal Register at least thirty days before their effective date. Universal Specialties, Inc. v. Blount, No. 71–337–EC (C.D.Calif., April 30, 1971).

Thereafter the regulations were revised and republished on May 5, 1971, with an express statement that the Post Office Department found good cause for making them effective as of the date of publication.

The notice stated:

> If the republication of the Department's regulations were subject to 5 U.S.C. 553(d), the substantive portions of the regulations would have to be published not less than 30 days in advance of the effective date, except as otherwise provided by the Department for good cause found and published with the rule. The republication of the regulations is not subject to 5 U.S.C. 553(d), because Resolution No. 71–14, adopted by the Board of Governors of the U. S. Postal Service on April 6, 1971, and published at page 7024 of the FEDERAL REGISTER of April 13, 1971, established April 13, 1971, as the effective date of 39 U.S.C. 410(a) (84 Stat. 725); 39 U.S.C. 410 (a) provides, among other things, that the provisions of chapter 5 of title 5 of the United States Code shall not apply to the exercise of the powers of the Post Office Department. Moreover, the Department finds that there is good cause for making the regulations effective as of the date of publication, since

> (a) All interested parties have had constructive notice of the substance of the regulations since last January;

> (b) The Department believes that most interested persons have actual notice of the substance of the regulations; and

> (c) To delay the effective date of the new regulations for 30 days might mean that the privacy of people who do not want to receive sexually oriented advertisements through the mail could be invaded with impunity, contrary to the explicit Congressional directions by which the Department is governed.

> The Department will continue to receive and retain any further written data, views, and comments concerning these regulations that interested persons may submit hereafter to the Assistant General Counsel, Mailability Division, U. S. Postal Service, Washington, D. C. 20260, and will give consideration to such matter as suggestions for future rule making.

For reasons stated later in the opinion, we consider that the May 5, 1971 regula-

tions are presently effective, and it is these regulations which must withstand judicial scrutiny.

The only portions which are significant for this action relate to the cost of subscriptions to the list and to addresses who have specifically requested sexually oriented advertisements. We quote their pertinent portions:

(d) *Availability of Postal Service List.*

(1) Copies of the list or portions thereof and periodic amendments thereto shall be available to any person by annual subscription or by purchase of individual issues of the list. A subscription year runs from January 1, through December 31, except that in 1971 the subscription year will be deemed to be from February 1, 1971 through December 31, 1971. * * * Annual subscribers to the list will receive the list in the form of computer tapes. * * * Requests for subscriptions must be accompanied by a check for $5,000 payable to the U. S. Postal Service. This money will be applied to the subscription price at the end of the year, and any excess will be refunded to the subscriber. The annual subscription price will be established following each subscription year, and will represent the net cost * * * prorated among the subscribers, of compiling, processing, printing, and distributing the List. In no event will the annual subscription price exceed $10,000. * * *

(2) This List may be used by mailers only to protect persons whose names appear on it from receiving unwanted sexually oriented advertisements through the mails. * * *

* * * * * *

(f) *Violations.* * * *

No person who mails sexually oriented advertisements only to persons who have specifically requested to receive the same will be deemed to have violated the statute or regulations, provided he is otherwise in compliance with the law, regardless of whether he has purchased and used the Post Office Department list.

### Issues of Law

On the basis of the facts set forth and the present status of the regulations, there remain for consideration by the court the following questions:

1. The validity of the basic statute, forbidding the mailing of sexually oriented advertisements to persons who have notified the Postal Service that they wish to receive no such material, and/or that they wish none sent to their children under 19;

2. The application of the statute to persons who have expressed a desire to receive such advertisements;

3. The right of Congress to charge mailers with the expense of the preparation of the list by the Postal Service;

4. The validity of the regulations in respect of (a) adequacy of publication and (b) delegation of authority;

5. The validity of the criminal penalties as they may affect mailers who violate the statute only because of inevitable computer errors in cleansing their mailing lists; and

6. The assertion by plaintiff Stewart that the necessity of using the legend violates his privilege against self-incrimination.

### 1. *The Basic Validity of the Statute*

The Goldwater amendment represents a continuation of Congressional attempts to limit the distribution of erotic literature to individuals who wish not to receive it. The most recent prior legislation attempting to deal with this problem is the Pandering law mentioned in the Facts. 39 U.S.C. § 3008 (formerly § 4009). Its constitutionality was sustained in Rowan v. United States Post Office Department, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). The Pandering law as construed by the Supreme Court permits individuals who in their sole discretion believe advertisements received from a mailer to be "erotically arousing

or sexually provocative" to request the Postal Service to issue an order prohibiting the sender from mailing any further mailings of *any* kind to such individual. The operative language of the statute permits a householder to bar any and all kinds of mailings from the particular mailer including such non-provocative items as dry goods catalogs.

The Goldwater amendment is an extension of the Pandering law in the sense that it affects not only a mailer who has received direct notification from the addressee, but all mailers who send sexually oriented advertisements as defined in the statute.

■ The principle of the *Rowan* case permits the government to aid an individual in protecting himself from unwanted mail. The fact that the notice authorized under the Goldwater amendment affects all mailers and not just a particular mailer does not destroy the applicability of the *Rowan* decision, in which the court said (397 U.S. at 737, 90 S.Ct. at 1490):

[A] mailer's right to communicate must stop at the mail box of an unreceptive addressee.

The Court has traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property.

Plaintiffs assert that the mailing list requirement of the Goldwater amendment impermissibly interposes the Postal Service between the mailer and the addressee. The Postal Service's responsibility under this statute, however, does not differ substantially from that sustained in *Rowan*; transmitting the request of an addressee to the mailer. The Postal Service may not add any names to the mailing list without the express direction of the addressee. No censorship powers are given the Postal Service prior to a court determination. Persons who desire to receive sexually oriented advertisements without government interference may do so. See part 2 of this opinion. *Cf.* Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). In certain instances the Postal Service may request the Attorney General to institute court proceedings, but it cannot impede the flow of mail to or from the offending mailer without court direction.

■ The present complaint deals with matter that is not obscene under the test of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), but that does not prevent the statute from being validly applicable.

■ The fact that the books which are advertised are entitled to First Amendment protection does not mean that the mailer's right to communicate ideas supersedes the right of the addressee "to be let alone." *Rowan*, 397 U.S. at 736, 90 S.Ct. at 1490. See Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). Plaintiffs rely on New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 2d 686 (1964) to support a contrary conclusion, but that case did not involve the communication through the mails of advertisements to unwilling recipients. The statute does not foreclose a bookseller or advertiser from reaching any audience (as the Pandering law does), but it says that people who have complied with the notification section of Section 3010 (b) must be reached only in more discreet ways than by depiction or explicit description of human genitalia, sexual intercourse, or acts of sadism or masochism.

■ The statute relates only to advertisements, and does not foreclose an author or publisher from any market, even with respect to books or other publications which explicitly depict human genitalia, sexual intercourse, acts of sadism, or acts of masochism. Commercial advertising is subject to a greater degree of regulation than other publications. Banzhaf v. Federal Communications Comm., 132 U.S.App.D.C. 14, 405 F.2d 1082, 1101 (1968).

■ Plaintiffs also attack the Goldwater amendment as vague in language, primarily because of the final clause "or

any other erotic subject directly related to the foregoing" in the statutory definition of "sexually oriented advertisement." 39 U.S.C. § 3010(d). The specific references to genitalia, intercourse, sadism and masochism are clear enough to satisfy fair standards of criminal definition; and the concluding phrase, which should be narrowly construed under the rule of *noscitur a sociis,* furnishes no basis for attack on the statute. Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Winters v. State of New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

■ The applicability of *Rowan* is not diminished by Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 429, 27 L.Ed.2d 498 (1971), which held that the Post Office cannot be authorized to issue administrative bar orders against obscene mail. The court there based its decision on the fact that:

> The scheme has no statutory provision requiring governmentally initiated judicial participation in the procedure which bars the magazines from the mails, or even any provision assuring prompt judicial review.

■ Plaintiffs assert also that the Goldwater amendment is invalid in spite of the *Rowan* case, because it imposes substantial costs on advertisers in order to comply. The figures for plaintiffs, excluding the subscription fee for the Postal Service list, are approximately $15,000 per year, as set forth above. The major item of costs is computer time, which bears a direct relation to the number of names on the mailing lists that must be cleansed. The court in *Rowan* held (397 U.S. at 740, 90 S.Ct. at 1492) that the cost of removing names to comply with the Pandering law did not amount to a violation of due process. For the reasons set forth in part 3 of this opinion, we rule that the costs here involved are not unduly burdensome as part of the cost of implementing an addressee's right to be free from objectionable mail. The President's Commission on Obscenity and Pornography approved

the idea of letting mail recipients protect themselves against all unwanted mail; but it recognized that if the Postal Service list contained a very large number of names, the cost of searching for them on a mailing list might prove "prohibitively expensive," and might require a different approach to regulation. Report of the Commission on Obscenity and Pornography (Bantam ed. 1970), pp. 68–69 (hereinafter cited as Report). The present costs, however, are not "prohibitively expensive."

With respect to small mailers, the variable expenses incurred for cleansing their mailing lists may become unduly burdensome, even though less in dollars than for larger mailers; we are not yet faced with that problem. The only small mailer in this case is Moe Shapiro, who is not subject to the statute for the reasons set forth in part 2 of this opinion.

■ Plaintiffs object to the statute also because it allows parents to control the receipt of sexually oriented advertisements by their 18-year old children, who reside with them or are under their "care, custody or supervision." These children are old enough to be required to register for Selective Service and to vote in national elections. In the absence of a particularized showing that any of this group of addresses have been unwillingly deprived of such materials, we deem it inappropriate to determine the validity of the statute respecting them, or to decide the plaintiffs' standing to assert their rights. *Cf.* Rowan v. United States Post Office Department, 397 U.S. at 741, 90 S.Ct. at 1493 (concurring opinion of Brennan, J.).

Similarly, we do not deal with the right of family members or others who are deprived of sexually oriented advertisements because someone else added a name to the list. Given the limitation of computers and scanning apparatus, a wife who puts her name on the list may prevent her husband from viewing any sexually oriented mail, and even unrelated persons of similar names in the same postal zone may be eliminated from

mailing lists. The record does not show how substantial this point is or what mechanical means may exist for meeting the problem.

### 2. *Solicited Advertisements*

The application of the statute to someone like Moe Shapiro, who sends sexually oriented ads only to those who specifically request them, involves different questions.

■■■■ The right to communicate ideas and information is an important corollary to the constitutional rights of freedom of speech and of the press. Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L. Ed. 1292 (1943). Any limitation of First Amendment rights must receive close scrutiny. McGowan v. State of Maryland, 366 U.S. 420, 449, 81 S.Ct. 1101, 1117, 6 L.Ed.2d 393 (1961). The Postal Service list requirement places some limitation on individuals wishing to send unsolicited sexually oriented advertisements; this is justified to the extent necessary in order to protect addressees who wish not to receive them. See *Rowan*, 397 U.S. at 736–737, 90 S.Ct. at 1490. The situation is different in the case of solicited advertisements, where the advertisements are sent only to addressees who have asked to receive them.

The rights of addressees may also be affected by regulation of mailings which they have requested. In Lamont v. Postmaster General, 381 U.S. 301, 307, 85 S.Ct. 1493, 1496, 14 L.Ed.2d 398 (1965), the Supreme Court held that the Post Office Department could not interpose a limitation upon individuals who wished to receive "communist political propaganda," even to the extent of requiring them to notify the Post Office that they in fact wanted to receive the mail. See also Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960).

■■■■ It is our duty, however, to decide the case without reaching constitutional objections if it is possible to do so. Rosenberg v. Fleuti, 374 U.S. 449, 451, 83 S.Ct. 1804, 1806, 10 L.Ed.2d 1000 (1963); Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). The Supreme Court recently read a time limitation into a pornography statute in order to avoid constitutional difficulties. United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).

■■■■ The Postal Service has removed any constitutional issue on this point by its revised regulations, published on May 5, 1971, which provide that mailers sending advertisements only to individuals who have specifically requested them are outside the purview of the Goldwater amendment. Section 124.9(f). As will be shown below, this interpretation of the statute is consistent with the purpose and legislative history of the statute.

The legislative history indicates no intent to affect the receipt of sexually oriented advertisements by those who have requested them in advance. The enactment of a statute to prevent "assaults upon privacy through *unsolicited* mailings" was recommended in a progress report of the Commission on Obscenity and Pornography issued in July 1969 (pp. 3, 13–16). (Emphasis added.) A Presidential Message supporting H. R. 15693, which was the forerunner of the Goldwater amendment, described the proposed statute as "providing added protection from the kind of smut advertising now being mailed, *unsolicited*, into many homes." (Emphasis added.) House Report No. 91–908, pp. 8–9. The House Report stated that the purpose of the bill was the "protection of the privacy of mail patrons who do not want to receive sexually oriented advertising." House Report, p. 1. In describing his amendment before the Senate, Senator Goldwater stated it was his understanding that the "amendment will completely bar the use of the U.S. mails as a means to distribute *unsolicited* and *unwanted* sexually related advertisements." (Emphasis added.) 103 Cong.Rec. 10178 (daily ed. June 29, 1970). The Congressional findings which were part of the Gold-

water amendment also specifically referred to the protection of persons from the receipt of unsolicited material. Pub.L. 91–375 § 14.

The statute need not be construed to cover broader ground than its sponsors intended. In view of the doubts about the constitutional right to interfere with mail which someone wants to receive, and giving full consideration to the statute's legislative history, it is proper to interpret the statute as not covering advertisements which the recipient has asked to have sent to him. United States v. Witkovich, 353 U.S. 194, 199, 77 S.Ct. 779, 782, 1 L.Ed.2d 765 (1957). For this reason, we find 39 U.S.C. § 3010 inapplicable to those mailers sending advertisements in response to written requests and Section 124.9(f) of the regulations valid. Addressees who have originally requested sexually oriented advertisements but no longer wish to receive them can utilize the provisions of Section 3008 to have their names removed from the mailing list.

Of course, our reading of the statute would not protect a mailer who uses an innocent initial advertisement to solicit requests for a follow-up advertisement that the recipient would not expect to be sexually oriented.

3. *The Charge for the Postal Service List*

The requirement that bulk mailers subscribe to the Post Office list involves two questions—First, the right to impose any charge, and second, the fairness of the allocation.

■ The intent of Congress was that bulk mailers should bear the expense of implementing the rights of mail recipients to be free from offensive unsolicited advertisements. Section 3010(b) provides that the Postal Service, in supplying the list of protesters to any mailer, may require "the payment of such service charge as it determines to be necessary to defray the cost of compiling and maintaining the list and making it available as provided in this sentence."

■ Assuming the right to regulate an industry, it is old law that the cost of regulation may be placed upon the industry. Charlotte, C & A R. Co., v. Gibbes, 142 U.S. 386, 12 S.Ct. 255, 35 L.Ed. 1051 (1892); Bronx Gas and Electric Co. v. Maltbie, 268 N.Y. 278, 197 N.E. 281 (1935); 8200 Realty Corp. v. Lindsay, 27 N.Y.2d 124, 134, 313 N.Y.S. 2d 733, 261 N.E.2d 647 (1970). See also 15 U.S.C. § 78o(b) (8) (concerning the Securities and Exchange Commission); 12 U.S.C. § 482 (concerning the expense of examining national banks); 7 U.S.C. § 2153 (the Animal Welfare Act).

■ Even in a field where First Amendment rights are involved, the collection of the cost of licensing is permitted. The general principle was laid down in Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), which involved a statute requiring a state license fee for a "parade, procession or open-air public meeting." The court upheld the fee because it was "not a revenue tax, but one to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." 312 U.S. at 577, 61 S.Ct. at 766. Where license fees have been struck down, it was because they were not related to the expense of regulation. In Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 116, 63 S.Ct. 870, 876, 87 L.Ed. 1292 (1943), a license fee which applied to door-to-door canvassers, including those who sold religious leaflets, was invalidated because

[T]he fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors.

Chief Justice Stone in Jones v. City of Opelika, 316 U.S. 584, 605, 62 S.Ct. 1231, 1243, 86 L.Ed. 1691 (1942) stated:

[W]here the state may, as a regulatory measure, license activities which it is without constitutional authority to tax, it may charge a small or nominal fee sufficient to defray the expense of licensing. * * *

This opinion, which was written as a dissent, was adopted by the Court in the following year on reargument of the case. 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290 (1943).

This case is not governed by Grosjean v. American Press, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), which struck down a state statute imposing a 2% tax on gross receipts derived from advertisements by newspapers with a circulation of over 20,000 copies per week. The court there pointed out that the direct tendency of the statute was to restrict circulation of material protected by the First Amendment and that

> [I]t is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guarantees. 297 U.S. at 250, 56 S.Ct. at 449.

Here we are dealing with a statute intended not to restrict the circulation of information to those interested in receiving it, but to implement Congressional findings that the traffic in offensive sexual advertisements is so large that individual citizens are helpless to protect their privacy without stronger federal controls.

### *Allocation of the Expense*

■ The method of allocating expenses is set forth in the Post Office Department regulations, and not in the statute. They require that a $5,000 deposit accompany any subscription, and provide that the subscription price, which may not exceed $10,000, shall be determined annually as follows (39 C.F.R. § 124.9(d) (1):

> The annual subscription price will be established following each subscription year, and will represent the net cost * * * prorated among the subscribers, of compiling, processing, printing, and distributing the List.

Plaintiffs assume that the cost will be prorated equally among subscribers, although this is not specified in the regulation.

In determining the effect of any allocation, the circumstances of the individual mailer must be considered. In Murdock v. Commonwealth of Pennsylvania, *supra*, 319 U.S. at 113, 63 S.Ct. at 875, Mr. Justice Douglas pointed out that if a "license tax is fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenues," it may lead to an impermissible suppression of First Amendment liberties.

It may be assumed that plaintiff Pent-R's share, after allocation at the end of the year, will be more than $5,000, in view of the substantial volume of its business, and the fact that it will require computer tapes of the names, and not just print-outs of the list. One whose allocation is less than $5,000 may expect a refund at the end of the year.

A figure of $5,000 to $10,000 is not nominal in the context of the license fees which municipalities sought to impose on sellers of Jehovah's Witnesses pamphlets. Murdock v. Commonwealth of Pennsylvania, *supra*. In this case, however, it should be considered in relation to plaintiffs' own mailing list of 3½ million names and the larger lists which it rents.

Combining the cost of purging the mailing list, described in Part 1 of this opinion, and the maximum subscription charge, plaintiffs' cost of complying with the statute is less than one cent per name, a fraction of the cost of postage, and is not unduly burdensome.

Since none of the plaintiffs in this case shows any present prejudice from any potential method of allocation of the cost of the Postal Service list, and the Postal Service has not stated the way in which it expects to prorate the cost, it is not necessary to deal further with the subject in this opinion.

### 4. *The Technical Validity of the Regulations*

The plaintiffs regard the regulations as invalid for failure to publish notice of the proposed rule-making for 30 days prior to its effective date (5 U.S.C. §

553), and for failure to have the rules promulgated by the Board of Governors of the Postal Service, as required by 18 U.S.C. § 1735.

### a. *Adequacy of Publication*

Various provisions of the 1970 Postal Reorganization Act (39 U.S.C. §§ 3010, 3011, and 18 U.S.C. §§ 1735–37) took effect on February 1, 1971. Pub.L. 91–375 § 15, printed on page 5 of the 1971 Supplement to 39 U.S.C.A.

The notice of proposed rule-making concerning sexually oriented advertisements was not published until the January 12, 1971 issue of the Federal Register. In order that the rules might become effective by February 1st, the notice called for comments to be received by January 20, 1971. 36 Fed.Reg. 433. After consideration of comments, the regulations were revised, and were published on January 30, 1971. 36 Fed.Reg. 1468. The Postal Service sought to compensate for the abbreviated time by promising that it would still consider additional comments after the effective date of the regulations.

The publication of amended regulations on May 5, 1971 removes any validity from plaintiffs' objections to the new regulations.

It is unnecessary to consider whether a regulation is valid if thirty days elapse between the initial publication and the court attack, as was decided in Borg-Johnson Electronics, Inc. v. Christenberry, 169 F.Supp. 746, 752 (S.D.N.Y. 1959, Kaufman, J.).

■ With respect to the amended regulations drafted with knowledge of the contentions in this case and the California case, we are satisfied that there was good cause for the Post Office Department's decision to make them effective on publication. 5 U.S.C. § 553(d) (3); see Buckeye Cablevision, Inc. v. F.

C. C., 128 U.S.App.D.C. 262, 387 F.2d 220, 228, f. n. 34 (1967).*

### b. *The Delegation of Authority*

■ Plaintiffs contend that the regulations issued by the Post Office Department on January 30, 1971 are invalid because 18 U.S.C. § 1735 is applicable to the violation of "regulations of the Board of Governors issued under [§ 3010]" and the regulations were issued by the Post Office Department. There is an apparent incongruity between the language of Section 1735 and that of Section 3010, which provides for the Postal Service to prescribe various details. The court finds that under either section, 3010 or 1735, the Post Office Department acting through the Postmaster General had proper authority to issue the regulations pertaining to the Goldwater amendment.

■ The power of the Postal Service to promulgate the regulations is vested in a Board of Governors appointed under the terms of the statute. 39 U.S.C. §§ 202, 401(2); Pub.L. 91–375 § 15(a). The Board of Governors on January 16, 1971 in Section 3.9 of the bylaws delegated broad powers to the Postmaster General by notice published in the Federal Register under authority of Section 401(2). 36 Fed.Reg. 688. This bylaw permits the Postmaster General to issue regulations in the name of the Board of Governors and implicitly in the name of the Postal Service. This delegation is not in conflict with the Congressional policy as demonstrated by 39 U.S.C. § 402, which permits the Board to delegate authority to the Postmaster General, and is scheduled to become effective on July 1, 1971. Resolution No. 71–9 of the Board of Governors.

■■ Plaintiffs also argue that it is unconstitutional to delegate to the Postmaster General the authority to issue regulations the violation of which is a crime. Congress, however, may provide

---

* We express no opinion on the question whether 39 U.S.C. § 410(a) makes all the provisions of 5 U.S.C. § 553 inapplicable, as the Postal Service notice of May 5, 1971 stated.

a criminal penalty for the violation of an administrative regulation made pursuant to and within the scope of a legislative act. Avent v. United States, 266 U.S. 127, 129, 45 S.Ct. 34, 35, 69 L.Ed. 202 (1924); McKinley v. United States, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668 (1919). The regulations issued by the Post Office Department in connection with Section 3010 as applied to Sections 1735–37 are reasonable and, except as otherwise stated in this opinion, are justified by the purpose and legislative history of the Goldwater amendment.

### 5. Criminal Penalties as Affected by Computer Errors

■ There are two sections of the Criminal Code which provide penalties for violation of the statute relating to sexually oriented advertisements. The first, 18 U.S.C. § 1735(a), punishes anyone who

> willfully uses the mails for * * * any sexually oriented advertisement in violation of section 3010 of title 39, or willfully violates any regulations of the Board of Governors issued under such section. * * *

The second, Section 1737(a), punishes

> whoever shall print, reproduce, or manufacture any sexually related mail matter, intending or knowing that such matter will be deposited for mailing * * * in violation of section 3008 or 3010 of title 39, or in violation of any regulation. * * *

Plaintiffs profess to fear that the omission of the word willfully from Section 1737 will impose penalties on printers like plaintiff Complete Offset Lithography, Inc., who know that computer errors must result in some sexually oriented advertisements being unintentionally delivered to persons on the Postal Service list.

We find plaintiffs' fears unrealistic. Neither the legislative history nor the plain intent of the statute call for so sweeping an interpretation. We read "knowing" as used in Section 1737 to require some act knowingly in violation of the statute other than merely staying in business and assuming normal attendant risks of computer error. Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); United States v. Thompson, D.C., 230 F.Supp. 530, 532, aff'd, 338 F.2d 997 (2d Cir. 1964). Beyond this, we need not and do not define in this action the precise limits of a printer's responsibility.

### 6. The Claim of Privilege against Self-Incrimination

■ Plaintiff Stewart points out that he has been indicted by the government in connection with other statutes, as doing business under the name of Pent-R-Books, Inc. and RAS Enterprises, Inc. He is concerned with the scope of the immunity provisions of 18 U.S.C. § 1736. That section forbids using any evidence obtained by a natural person's compliance with the Goldwater amendment or his performance of any act in compliance therewith as evidence against him in a criminal proceeding, other than one for furnishing false information.

Plaintiff Stewart asserts that this is merely transactional immunity and that he is entitled to broader protection.

He does not show, however, how he will risk any criminal prosecution by complying with the Goldwater amendment. This should be a step precedent to any consideration by the court of constitutional attacks on the statute. See International Longshoremen's and Warehousemen's Union, Local 37 v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954).

### Conclusion

■ The Goldwater amendment is constitutional as applied to the plaintiffs at the present time, under regulations which permit the words "Sexually Oriented Ad" to be placed on a sealed inner envelope. To avoid constitutional

**314**

doubts, the statute should be construed, as the Postal Service has now properly done, as not requiring subscription to the Postal Service list by mailers who send sexually oriented advertisements only to persons who have requested such advertisements.

The regulations were validly adopted, and are valid in their current form, but the court does not determine the proper method for the Postal Service to use in prorating the cost of the service among the subscribers.

The criminal penalties of 18 U.S.C. § 1737 are deemed to apply only where there has been some act knowingly in violation of the statute or regulation.

In view of the amendments of the regulation during the pendency of this action, and the interpretive statement of the Post Office Department, there is no longer any need for injunctive relief.

There are no material controverted issues of fact. The case may therefore be determined on the merits on the basis of the motions made at the hearing before the three-judge court.

It is therefore ordered that the preliminary injunction heretofore issued be dissolved and the prayer for a permanent injunction denied; and it is

Ordered and adjudged, (1) that the complaint be dismissed as moot insofar as it seeks relief against application of the statute to mailings to persons who have requested sexually oriented advertisements, and insofar as it seeks relief against the regulation concerning (a) the legend to be placed on mailing envelopes or covers and (b) limitations on the use of purged mailing lists; and (2) that the complaint in all other respects be dismissed on the merits, on the basis of the statute as interpreted in this opinion and the regulations now in force, without prejudice to any future action based on new facts concerning the confiscatory nature of the expense of complying with the statute, the effect of the statute on 18-year old addressees, or the danger of self-incrimination in reference to plaintiff Stewart.