EDWARD H. HYNES, HUGH STIER, ANTHONY BARONE, MARITZA KOUGASIAN AND SUSAN DE PRIMA, PLAINTIFFS-RESPONDENTS, v. THE MAYOR AND COUNCIL OF THE BOROUGH OF ORADELL, AND THE BOROUGH OF ORADELL, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS.

Argued October 21, 1974—Decided January 24, 1975.

*Mr. James A. Major* argued the cause for defendants-appellants (*Messrs. Major and Major,* attorneys).

*Mr. Melvin Soloman* argued the cause for plaintiffs-respondents Stier, Barone, Kougasian and DePrima (*Mr. Ned J. Parsekian,* attorney).

*Mr. Lary I. Zucker* argued the cause for respondent Hynes (*Mr. Jay W. Greenstone,* attorney).

The opinion of the Court was delivered by

CLIFFORD, J. Plaintiff Hynes has been a member of the General Assembly of the State of New Jersey since 1972. His election district includes the Borough of Oradell. The remaining plaintiffs are registered voters in Oradell. In 1973 the Borough adopted an amendment to its general canvassing and soliciting ordinance. By the terms of that amendment, entitled Ordinance 598, candidates for public office, among others, are required to give the local police department written notification before calling from house to house during an election campaign.

By this action plaintiffs seek a declaration of the unconstitutionality of the enactment and an injunction against its enforcement. Hynes argues that it inhibits his rights of free speech and of communication with his constituents in contravention of the First and Fourteenth Amendments to the United States Constitution. The remaining plaintiffs urge First, Fourteenth and Fifteenth Amendment grounds of invalidity, founded on an asserted frustration of their interests in casting informed and educated votes and in communicating with public officials. They contend candidates will, because of the "chilling effect" of the ordinance, avoid confronting its requirements and hence elect not to campaign in Oradell.

The trial court found this enactment "unconstitutional, void and unenforceable" as an infringement on plaintiffs' First Amendment rights. In addition, it deemed the ordinance defective because no penalty provision was included. This latter finding is the single ground upon which the Appellate Division, in an unreported opinion, rested its affirmance. A substantial constitutional issue being projected, the Borough appeals to this Court as of right. *R.* 2:2–1 (a)(1).

■ While the appeal was pending here, the absence of a penalty clause, correctly perceived as a fatal deficiency by the courts below, was remedied by adoption of another amendatory ordinance, 598–A, providing for a penalty on violation and including also recitals as to the purpose and intent of the enactment. At oral argument all counsel agreed the record should be molded to bring before us the latest ordinance for a determination of its validity. This is in keeping with the general rule permitting scrutiny of the law in question as it exists at the time of appellate review, *S. & L. Associates, Inc. v. Washington Twp.*, 35 N. J. 224, 227 (1961). Consequently, we direct our attention to Ordinance 598–A, enacted July 16, 1974.

The provisions of which plaintiffs complain read in substantial part as follows:

Any person desiring to canvass, solicit or call from house to house in the Borough for a recognized charitable cause, or any person desiring to canvass, solicit or call from house to house for a Federal, State, County or Municipal political campaign or cause, shall be required to notify the Police Department, in writing, for identification only. Said notification shall be good for the duration of the campaign or cause.

■ The thrust of plaintiffs' attack is that the ordinance is facially invalid as constituting a prior restraint on the freedoms of speech and assembly; and that, as expressed in their brief, "[w]here fundamental freedoms are concerned, any governmental impediment, no matter how slight, cannot be constitutionally countenanced. The interests of the state must of necessity give way to protection of First Amendment values." These expansive propositions must be rejected on the facts of this case, substantially for the reasons set forth in our opinion in *Collingswood v. Ringgold*, 66 N. J. 350 (1974), decided this day.

Initially we observe that while the ordinance before us in *Collingswood* was "not a model of clarity," 66 N. J. 350 at 364, the Oradell ordinance makes unmistakable the activity intended to be regulated and the persons brought within its

ambit. It addresses door-to-door ventures of charitable solicitors, political campaigners and advocates in behalf of political causes. In this respect it could hardly be more clear.

Secondly, the only requirement of the enactment is one of simple identification. It may be satisfied in writing, suggesting that resort may be had to the mails. It need be fulfilled only once for each campaign. There is no fee. The applicant does not have to obtain or carry a card or license. And perhaps most importantly, no discretion reposes in any municipal official to deny the privilege of calling door to door. The ordinance is plainly an identification device in its most basic form.

In *Collingswood* we have today approved the use of such neutral identification requirements as being a "legitimate tool in the hands of municipalities," 66 *N. J.* at 369. In that case we were faced with conduct which admittedly had a commercial element, defendants there being market research surveyors. In the instant case plaintiff Hynes' activity is "purer" in the sense that it is not diluted in any degree by commercial overtones; but it is nevertheless "conduct which amounts to more than the right of free discussion comprehends," *Thomas v. Collins,* 323 *U. S.* 516, 540, 65 S. Ct. 315, 327, 89 *L. Ed.* 430, 446 (1945), for the reason that it takes place not in public areas, traditionally the scene of uninhibited discussion, but rather is house-to-house in nature. That being so, different societal concerns are implicated, justifying an identification regulation. Since we deem such registration requirements to be neutral regulations akin to those of time, place and manner, see *Collingswood, supra,* 66 *N. J.* 350 at 365–366, the sole consideration is that they be "reasonable." See *Thomas v. Collins, supra,* 323 U. S. at 540, 65 S. Ct. at 327, 89 *L. Ed.* at 446; *Poulos v. New Hampshire,* 345 *U. S.* 395, 405, 73 S. Ct. 760, 766, 97 *L. Ed.* 1105, 1114 (1953).

Collingswood's identification requirements were found to be a reasonable means of protecting the municipality's resi-

dents "against a sense of unease and dangers reasonably to be apprehended on account of strangers filtering through the community," 66 *N. J.* 350 at 357. Precisely the same concerns of the municipality are presented in this case, as demonstrated in the ordinance's prefatory recitals:

WHEREAS, the Borough of Oradell is primarily a one family residential town whose citizens are employed elsewhere, resulting in the wives of the wage earner being left alone during the day; and

WHEREAS, because of the geographical location of most of the homes it is impossible to police all areas at the same time, resulting in a number of break and entries and larceny in the home; and

WHEREAS, it is in the public interest and the public safety that persons not be permitted to call from house to house on the pretext of soliciting votes for a designated candidate or signatures for a nominating petition, or to solicit for a recognized charitable cause or borough activity, without such persons being first identified by the Police Department; and

WHEREAS, the Mayor and Borough Council of The Borough of Oradell feel that it is in the public interest and for the protection of The Borough of Oradell that such persons be required to notify the Police Department for the purpose of identification. * * *

That a situation exists giving rise to a legitimate concern on the part of the municipal authorities is evidenced by the affidavit of the Chief of Police and a map of the Borough showing the locations of "break and entries" in 1972. The Chief's affidavit recites a total of 199 "breakings and enterings" within the Borough from 1969 to May, 1973, and 145 larcenies during 1972 — perhaps not dramatic numbers by comparison with metropolitan statistics of unhappy magnitude but nevertheless sufficient, in the Chief's words, to create "a problem in the area of law enforcement" for this small community of 8,903 (according to the 1970 census). We cannot label as unreasonable the effort to address this problem, in part, by requiring candidates for public office and others denominated in the ordinance to identify themselves before going through Oradell house to house. A simple identification device is an acceptable means of protecting the residents of a community against the ap-

382

prehension of unwarranted intrusion. See authorities collected in *Collingswood v. Ringgold, supra,* 66 *N. J.* at 367–369.

At oral argument the attorney for plaintiff Hynes candidly admitted, as indeed he was obliged to by the circumstances, that he could conceive of no lesser form of intrusion on the right of free speech, other than absolutely no intrusion, than the identification device here. Neither can this Court. Such a device is not a constitutionally cognizable interference with a First Amendment right nor with any of the other rights of plaintiffs herein.

The judgment of the Appellate Division is reversed and the matter remanded to the Chancery Division for entry there of judgment in favor of defendants. No costs.

HALL, J. (dissenting). It is elementary that all police power legislation — this ordinance falls in that category — must be reasonable. The regulation must not be "arbitrary or capricious, the means selected must have a real and substantial relation to the object sought to be attained, and *the regulation or proscription must be reasonably calculated to meet the evil and not exceed the public need or substantially affect uses which do not partake of the offensive character of those which cause the problem sought to be ameliorated."* *Kirsch Holding Co. v. Borough of Manasquan,* 59 *N. J.* 241, 251 (1971). (emphasis supplied).

In my view, the ordinance before us clearly runs afoul of the emphasized portion of this quotation and I would nullify it on that ground alone without having to delve into difficult First Amendment problems. It seems to me so plain silly to require written registration with the police department of a small town before one can engage in the publicly desirable activity of soliciting support from the local citizenry for a political candidate or cause (as distinct from commercial house-to-house selling by strangers), on the pretext that such a requirement would help keep burglars and sneak thieves out of town, that it must be said, as matter of law, that the requirement exceeds the

public need and substantially affects desirable conduct not sufficiently related to the claimed evil.

I would affirm the invalidation of the ordinance.

PASHMAN, J. (dissenting). In 1973 plaintiff Edward Hynes was a member of the New Jersey Assembly and a candidate for re-election, although, due to intervening reapportionment, his district included the Borough of Oradell, which he had not previously represented. He conducted his campaign principally by personal house-to-house canvassing of voters. In this suit, he and a number of voters residing in Oradell claim that Oradell Ordinance No. 598-A, which requires registration with the municipal police department of political canvassers, unconstitutionally infringes on their right to freedom of speech and assembly protected by the first amendment to the federal constitution and *N. J. Const.* (1947), Art. I, ¶ 6.[1]

The majority treats the issues in this case as being essentially identical to those decided today in *Collingswood v. Ringgold, et al.,* 66 *N. J.* 350 (1975). This initial premise is mistaken and, unfortunately, has led the majority to a correspondingly mistaken conclusion. As I noted in my concurring opinion to that decision, 66 *N. J.* 350, at 374, *Collingswood v. Ringgold* concerned commercial speech, which is substantially outside the zone of protection created by the first amendment. *Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations,* 413 *U. S.* 376, 93 S. Ct. 2553, 37 L. Ed. 2d 669 (1973); *Valentine v. Chrestensen,* 316 *U. S.* 52, 62 S. Ct. 920, 86 L. Ed. 1262 (1942); *Passaic Daily News v. Blair,* 63 *N. J.* 474 (1973). In the present case

---

[1]Plaintiffs do not suggest that *N. J. Const.* (1947), Art. I, ¶ 6 affords them more protection that the first amendment, and therefore I see no need to pursue that issue here. We are, of course, not bound to limit the protection provided by our State constitution to that provided by the federal constitution. *Robinson v. Cahill,* 62 *N. J.* 473 (1973) *cert.* denied 414 *U. S.* 976, 94 S. Ct. 292, 38 L. Ed. 2d 219 (1973).

we are concerned with efforts by a candidate for political office to communicate with voters, speech which is unquestionably within the protection of the first amendment.

Indeed, if one were to range various types of speech according to the degree of protection to which they are entitled, the type of speech involved in this case would certainly come first, for free communication between voters and holders of and candidates for elective office is one of the prior conditions to the possibility of free, representative government. The right of candidates to make their positions known to the voters, and of voters to express their views on public issues to candidates for and holders of elective office is the very substance of the democratic process. As Prof. Alexander Meiklejohn, perhaps the leading expositor of the primacy within the protection of the first amendment of speech associated with political processes, has observed:

The principle of freedom of speech springs from the necessities of the program of self-government. It is not a Law of Nature or of Reason in the abstract. It is a deduction from the basic American agreement that public issues shall be decided by universal suffrage. [*Meiklejohn, Free Speech and Its Relationship to Self-Government* (1948) 26–27].

The United States Supreme Court has expressed the same thought more briefly: "* * * [T]he exercise of the rights [of freedom of speech and press] lies at the foundation of free government." *Schneider v. Irvington*, 308 *U. S.* 147, 161, 60 S. Ct. 146, 151, 84 L. Ed. 155 (1939). *See generally, Emerson, The System of Freedom of Expression* (1970), 6–7; Brennan, "The Supreme Court and the Meiklejohn Interpretation of the First Amendment," 79 *Harv. L. Rev.* 1 (1965); Kalven, "The New York Times Case: 'A Note on the Central Meaning of the First Amendment,' " 1964 *Sup. Ct. Rev.* 191 (1964).

We are thus not confronted with speech beyond the protection of the first amendment, nor even speech deserving ordinary protection of the first amendment, but rather speech

requiring quite extraordinary attention. Prof. Meiklejohn
has properly stated this constitutional principle:

\* \* \* [The First Amendment] protects the freedom of those activi-
ties of thought and communication by which we "govern."

\*       \*       \*       \*       \*       \*       \*       \*

In specific language of the Constitution, the governing activities
of the people appear only in terms of casting the ballot. But in the
deeper meaning of the Constitution, voting is merely the external ex-
pression of a wide and diverse number of activities by means of which
citizens attempt to meet the responsibilities of making judgments,
which freedom to govern lays upon them.

\*       \*       \*       \*       \*       \*       \*       \*

The responsibilities mentioned are of three kinds. We, the people
who govern, must understand the issues which, incident by incident,
face the nation. We must pass judgment upon the decisions which
our agents make upon those issues. And, further, we must share in
devising methods by which those decisions can be made wise and
effective or, if need be, supplanted by others which promise greater
wisdom and effectiveness. \* \* \* These are the activities to whose
freedom [the First Amendment] gives unqualified protection.
[Meiklejohn, "The First Amendment is an Absolute," 1961 *Sup. Ct.
Rev.* 245, 255 (1961)].

The view expressed by Prof. Meiklejohn, that speech as-
sociated with the functioning of democratic processes de-
serves an extraordinary degree of protection, has been sub-
stantially adopted by the United States Supreme Court. *See
Garrison v. Louisiana,* 379 *U. S.* 64, 85 S. Ct. 209, 13 L. Ed.
2d 125 (1964) ; *New York Times Co. v. Sullivan,* 376 *U. S.*
254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) ; Redish, "The
First Amendment in the Marketplace: Commercial Speech
and the Value of Free Expression," 39 *Geo. Wash. L. Rev.*
429 (1971) ; Brennan, "The Supreme Court and the Meikle-
john Interpretation of the First Amendment," 79 *Harv. L.
Rev.* 1 (1965) ; Comment, "Privacy, Defamation, and the
First Amendment," 67 *Colum. L. Rev.* 926 (1967).[2]

---

2The position that speech associated with democratic processes
deserves special protection from governmental regulation should not
be confused with the wholly distinct issue of whether unwilling com-
munications media can be required to give favored treatment to such
speech. *E. g., Lehman v. Shaker Heights,* 418 *U. S.* 298, 94 S. Ct.

The Oradell ordinance, which, in its amended form, merely requires a single registration by each canvasser during each campaign, solely for purposes of identification, would, on its face, appear to impose no serious burden on the exercise of first amendment rights. A restrictive regulation, however, need not actually prohibit exercise of such rights to violate the first amendment. A regulation which may reasonably be anticipated to have the practical effect of discouraging some persons from exercising their first amendment rights, which "chills" exercise of those rights, is equally unconstitutional. *Gooding v. Wilson,* 405 *U. S.* 518, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972); *Keyishian v. Bd. of Regents,* 385 *U. S.* 589, 87 S. Ct. 675, 17 L. Ed. 2d 629 (1967); *Baggett v. Bullitt,* 377 *U. S.* 360, 84 S. Ct. 1316, 12 L. Ed. 2d 377 (1964); *Speiser v. Randall,* 357 *U. S.* 513, 78 S. Ct. 1332, 2 L. Ed. 2d 1460 (1958); *cf. Dombrowski v. Pfister,* 380 *U. S.* 479, 85 S. Ct. 1116, 14 L. Ed. 2d 22 (1965).

The events of the past two and one-half years, revealed in the course of the proceedings that ultimately led to the resignation of the President of the United States and many of his closest advisors, demonstrate all too clearly the consequences that may befall persons who become identified as active advocates of political candidates or causes. The use of petty harassment, discriminatory enforcement of tax and regulatory laws, intensive surveillance by law enforcement agencies, and actual criminal depredations against persons identified with political adversaries is now familiar and well-documented.[3]

2714, 41 *L. Ed.* 2d 770 (1974); *Miami Herald Publishing Co. v. Tornillo,* 418 *U. S.* 241, 94 S. Ct. 2831, 41 *L. Ed.* 2d 730 (1974); *Columbia Broadcasting System, Inc. v. Democratic National Comm.,* 412 *U. S.* 94, 93 S. Ct. 2080, 36 L. Ed. 2d 772 (1973). The latter issue involves quite different considerations.

[3] *See, e. g., House Jud. Comm., Impeachment of Richard Nixon, President of the United States,* H. R. Rep. No. 1305, 93d Cong. 2d Sess. (1974), documenting organization and implementation of an intelligence gathering plan directed against political opponents and

To similar effect, one may recall the history of the civil rights movement in the south. Persons who became identified as sympathetic to that political movement suffered "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," *NAACP v. Alabama ex rel. Patterson*, 357 *U. S.* 449, 462, 78 S. Ct. 1163, 1172, 2 L. Ed. 2d 1488 (1958), and public officials hostile to this political phenomenon engaged in a calculated and subtle strategy to suppress the movement by forcing public disclosure of the identities of its sympathizers. *See NAACP v. Alabama ex rel. Patterson, supra; Bates v. Little Rock*, 361 *U. S.* 516, 80 S. Ct. 412, 4 L. Ed. 2d 480 (1960); *Shelton v. Tucker*, 364 *U. S.* 479, 81 S. Ct. 247, 5 L. Ed. 2d 231 (1960).

These are, of course, the most familiar and spectacular examples of the risks to which identified advocates of political issues and candidates may be exposed. It would, though, be naive indeed to treat them as mere isolated and aberrational incidents.

The Oradell ordinance requires all political canvassers, including not only political candidates, who arguably assume a certain risk of the consequences of public exposure, but also persons who canvass on behalf of a political candidate or in conection with any political cause, to register with the police. The United States Supreme Court has repeatedly cautioned against placing local police officials in a position where they may, advertently or inadvertently, become active agents in the suppression of free speech. *See, e. g., Cox v. Louisiana*, 379 *U. S.* 536, 85 S. Ct. 453, 13 L. Ed. 2d 471 (1965); *Kunz v. New York*, 340 *U. S.* 290, 71 S. Ct. 312, 95 L. Ed. 280 (1951); *Saia v. New York*, 334 *U. S.* 558, 68 S. Ct. 1148, 92 L. Ed. 1574 (1948); *Schneider v. Irvington*, 308 *U. S.* 147, 60 S. Ct. 146, 84 L. Ed. 155 (1939).

involving illegal wiretaps and breaking and entering, *id.* at 35–41, 157–70; attempts to instigate discriminatory Internal Revenue Service investigations of political opponents and their supporters, *id.* at 141–45; surveillance of political opponents by federal law enforcement agencies, *id.* at 146–47.

In light of these facts, it is not unreasonable that some persons may be dissuaded from exercising their first amendment rights where exercise of these rights is conditioned upon compliance with an ordinance such as the one before the Court in the present case. It is that substantial possibility which casts doubt on the constitutionality of this ordinance. The fact that the record does not reveal any pattern of harassment directed against plaintiff Hynes is, of course, irrelevant. It is the possible chilling effect of the ordinance that is constitutionally relevant, not the occurrence of any actual incidents of harassment. *Gooding v. Wilson, supra; Coates v. Cincinnati,* 402 *U. S.* 611, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971) ; cf. *Dombrowski v. Pfister, supra.*

In a series of cases during the past 20 years, the Supreme Court has held that the first amendment protects the right of individuals to engage in political activity without giving up the shield of relative anonymity. In *Talley v. California,* 362 *U. S.* 60, 80 S. Ct. 536, 4 L. Ed. 2d 559 (1960), the Court struck down a municipal ordinance prohibiting the distribution of anonymous handbills, holding that the requirement that a name and address be printed on the leaflet may have a chilling effect on the exercise of first amendment rights. Similarly, it has held that politically controversial organizations cannot be required to disclose their membership lists to state officials. *Bates v. Little Rock, supra; NAACP v. Alabama ex rel. Patterson, supra,* and, absent a showing of a strong state interest, state employees cannot be required to disclose their membership in political organizations. *Shelton v. Tucker, supra.* Cf. *Lamont v. Postmaster General,* 381 *U. S.* 301, 85 S. Ct. 1493, 14 L. Ed. 2d 398 (1965) ; *Wulp v. Corcoran,* 454 *F.* 2d 826 (1 Cir. 1972) ; *Strasser v. Doorley,* 432 *F.* 2d 567 (1 Cir. 1970).

Defendant municipality suggests that this case is governed by *Laird v. Tatum,* 408 *U. S.* 1, 92 S. Ct. 2318, 33 L. Ed. 2d 154 (1972) and *Anderson v. Sills,* 56 *N. J.* 210 (1970), rather than by these cases. *Tatum* and *Anderson,* which in-

volved the possible chilling effect of military and State Police surveillance of activities which had the potential to cause mass civil disturbances, are distinguishable from the present case on a number of grounds. The government surveillance upheld in those cases did not extend to routine political activities but was focused on a limited class of activities threatening mass civil disturbance. In neither case did the parties even suggest that the type of activities complained of had ever been implicated in any actual attempts to interfere with exercise of first amendment rights. Most important, in neither case was the exercise of first amendment rights specifically conditioned (under pain of criminal prosecution) on the speaker's providing the information to the government which might be used for purposes of interference with his rights.

In my view, the Oradell ordinance has the potential to have a significant chilling effect on the exercise of first amendment rights and thus infringes on these rights. The proper rule applicable to this case was stated by the United States Supreme Court 30 years ago in *Thomas v. Collins,* 323 *U. S.* 516, 540, 65 S. Ct. 315, 327, 89 L. Ed. 430 (1945) :

> If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and for imposing a penalty for violating such a restraining order. So long as no more is involved than exercise of the rights of free speech and free assembly, it is immune to such a restriction. If one who solicits support for the cause of labor may be required to register as a condition to the exercise of his right to make a public speech, so may he who seeks to rally support for any social, business, religious or political cause. We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment.

This principle was forcefully reaffirmed in *Lamont v. Postmaster General, supra.* We are not free to abandon it here, and I would no do so even if we were.[4]

A regulation infringing on first amendment rights may be sustained only upon a demonstration that it is justified by a "compelling state interest." *Williams v. Rhodes, 393 U. S. 23, 31, 89 S. Ct. 5, 21 L. Ed. 2d 24 (1968); United States v. O'Brien, 391 U. S. 367, 376–377, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968); NAACP v. Button, 371 U. S. 415, 438–439, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963); Thomas v. Collins, 323 U. S. 516, 529–530, 65 S. Ct. 315, 89 L. Ed. 430 (1945).* In the present case, the municipality contends that the ordinance is intended to facilitate apprehension of possible criminals. According to the affidavit of Chief of Police George Brugnoli, residents of Oradell have been instructed to report unknown canvassers and suspicious individuals to the police. The existence of the registration requirement permits the police to establish the identity of registered canvassers without investigation. While I do not doubt that this explanation is given in good faith and was the true motive for enactment of the ordinance, I find it a frail basis for the resulting infringement of first amendment rights.

The only information a canvasser is required by the ordinance to provide is his name. The ordinance is of no value when the police receive a report that a suspicious stranger has been seen or that an unfamiliar, unidentified canvasser

---

4While the above discussion focuses principally on the rights of plaintiff Hynes, it should be noted that the other plaintiffs, voters in Oradell, have an equal and reciprocal constitutional right to hear the view of Hynes. *Kleindienst v. Mandel,* 408 *U. S.* 753, 762–763, 92 S. Ct. 2576, 33 L. Ed. 2d 683 (1972); *Stanley v. Georgia,* 394 *U. S.* 557, 564, 89 S. Ct. 1243, 22 L. Ed. 2d 542 (1969); *Lamont v. Postmaster General,* 381 *U. S.* 301, 307–308, 85 S. Ct. 1493, 14 L. Ed. 2d 398 (1965) (Brennan, J. concurring). The voter plaintiffs seek to preserve their opportunity for the "sustained, face-to-face debate, discussion and questioning" which the United States Supreme Court has recognized as deserving special protection. *Kleindienst v. Mandel, supra,* 408 *U. S.* at 765; 92 S. Ct. 2576; *Pell v. Procunier,* 417 *U. S.* 817, 823, 94 S. Ct. 2800, 2804, 41 *L. Ed.* 2d 495, 502 (1974).

is going from house-to-house. Even if a householder reports the canvasser's name and the police confirm that he has registered, the police know only that someone of that name claims to be canvassing for some cause. They know nothing about whether the cause is bona fide or whether the individual has a criminal record or criminal intentions, or even if he is who he claims to be. It is difficult to imagine any circumstances in which the information which the ordinance requires to be provided would be useful to the police in their efforts to prevent crime. Such a rationale does not rise to the level of "compelling state interest."

Nor can the municipality free itself from its burden of proof by characterizing the ordinance as a mere regulation of the time, place or manner of speech. It is, of course, well established that the state may make reasonable regulations concerning forms of speech which would grossly disrupt the normal usage of the location. *E. g., Grayned v. Rockford,* 408 *U. S.* 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) (disruption of school sessions) ; *Adderley v. Florida,* 385 *U. S.* 39, 87 S. Ct. 242, 17 L. Ed. 2d 149 (1966) (demonstration obstructing entrances to jail) ; *Cox v. Louisiana,* 379 *U. S.* 536, 554, 85 S. Ct. 453, 13 L. Ed. 2d 471 (1965) (obstruction of flow of traffic in urban business district) ; *Kovacs v. Cooper,* 336 *U. S.* 77, 69 S. Ct. 448, 93 L. Ed. 513 (1949) ("loud and raucous" use of a sound truck) ; *Cox v. New Hampshire,* 312 *U. S.* 569, 576, 61 S. Ct. 762, 85 L. Ed. 1049 (1941) (overlapping parades). Such regulations, however, must not only be neutral as to content, *Chicago Police Dept. v. Mosley,* 408 *U. S.* 92, 99, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972), but they must not have the effect of substantially depriving any class of persons from exercising first amendment rights. *See Martin v. Struthers,* 319 *U. S.* 141, 63 S. Ct. 862, 87 L. Ed. 1313 (1943) ; *Lovell v. Griffin,* 303 *U. S.* 444, 58 S. Ct. 666, 82 L. Ed. 949 (1938) ; *cf. Williams v. Rhodes,* 393 *U. S.* 23, 89 S. Ct. 5, 21 L. Ed. 2d 24 (1968).

For a political candidate or an advocate of a political cause with small financial resources, personal door-to-door

canvassing is often the only practical means of reaching the voters. It is no solace to such people to suggest that they may conduct radio, television, or newspaper campaigns, that they may print campaign literature and distribute it on the street corners, or they may organize mass rallies. As the United States Supreme Court noted in holding unconstitutional an ordinance barring door-to-door solicitation:

* * * [A]s every person acquainted with political life knows, door to door campaigning is one of the most accepted techniques of seeking popular support, while the circulation of nominating papers would be greatly handicapped if they could not be taken to the citizens in their homes. Door to door distribution of circulars is essential to the poorly financed causes of little people. [*Martin v. Struthers, supra* 319 *U. S.* at 146, 63 S. Ct. at 865].

Defendant does not deny that plaintiff Hynes had but limited means to carry on his campaign and was therefore forced to rely to a large degree on door-to-door canvassing. A person in Hynes' financial position who is dissuaded by the Oradell ordinance from canvassing door-to-door is, in effect, almost entirely insulated from the voters he must communicate with both to be elected to office and to competently perform his representative function once he is in office.

We must not be deceived by the seemingly innocuous character of the municipal ordinance before us.

"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." [*Lamont v. Postmaster General,* 381 *U. S.* 301, 309, 85 S. Ct. 1493, 1498, 14 L. Ed. 2d 398 (1965) (Brennan, J. concurring), quoting *Boyd v. United States,* 116 *U. S.* 616, 635, 6 S. Ct. 524, 29 L. Ed. 746 (1874)].

On its face the ordinance may not seem repulsive; but its respectability is suspect. It follows that we must be alert, careful and on guard against any deviations.

I would affirm.

*For reversal and remandment*—Chief Justice HUGHES and Justices JACOBS, MOUNTAIN, SULLIVAN and CLIFFORD—5.

*For affirmance*—Justices HALL and PASHMAN—2.