# LAMONT, dba BASIC PAMPHLETS v. POSTMASTER GENERAL.

No. 491.  Argued April 26, 1965.—Decided May 24, 1965.*

*Leonard B. Boudin* argued the cause for appellant in No. 491.  With him on the briefs were *Victor Rabinowitz, Norman Dorsen* and *Henry Winestine.*

*Solicitor General Cox* argued the cause for appellee in No. 491 and appellants in No. 848.  With him on the brief were *Assistant Attorney General Yeagley, Nathan Lewin, Kevin T. Maroney* and *Lee B. Anderson.*

*Marshall W. Krause* argued the cause for appellee in No. 848.  With him on the brief was *Lawrence Speiser.*

*Nanette Dembitz* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal in No. 491 and affirmance in No. 848.

---

*Together with No. 848, *Fixa, Postmaster, San Francisco, et al.* v. *Heilberg,* on appeal from the United States District Court for the Northern District of California.

Mr. Justice Douglas delivered the opinion of the Court.

These appeals present the same question: is § 305 (a) of the Postal Service and Federal Employees Salary Act of 1962, 76 Stat. 840, constitutional as construed and applied? The statute provides in part:

"Mail matter, except sealed letters, which originates or which is printed or otherwise prepared in a foreign country and which is determined by the Secretary of the Treasury pursuant to rules and regulations to be promulgated by him to be 'communist political propaganda,' shall be detained by the Postmaster General upon its arrival for delivery in the United States, or upon its subsequent deposit in the United States domestic mails, and the addressee shall be notified that such matter has been received and will be delivered only upon the addressee's request, except that such detention shall not be required in the case of any matter which is furnished pursuant to subscription or which is otherwise ascertained by the Postmaster General to be desired by the addressee." 39 U. S. C. 4008 (a).

The statute defines "communist political propaganda" as political propaganda (as that term is defined in § 1 (j) of the Foreign Agents Registration Act of 1938 [1]) which is

---

[1] "The term 'political propaganda' includes any oral, visual, graphic, written, pictorial, or other communication or expression by any person (1) which is reasonably adapted to, or which the person disseminating the same believes will, or which he intends to, prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public within the United States with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party or with reference to the foreign policies of the United States or promote in the United States racial, religious, or social dissensions, or (2) which advocates, advises, instigates, or promotes any racial, social, political, or religious

issued by or on behalf of any country with respect to which there is in effect a suspension or withdrawal of tariff concessions or from which foreign assistance is withheld pursuant to certain specified statutes. 39 U. S. C. § 4008 (b). The statute contains an exemption from its provisions for mail addressed to government agencies and educational institutions, or officials thereof, and for mail sent pursuant to a reciprocal cultural international agreement. 39 U. S. C. § 4008 (c).

To implement the statute the Post Office maintains 10 or 11 screening points through which is routed all unsealed mail from the designated foreign countries. At these points the nonexempt mail is examined by Customs authorities. When it is determined that a piece of mail is "communist political propaganda," the addressee is mailed a notice identifying the mail being detained and advising that it will be destroyed unless the addressee requests delivery by returning an attached reply card within 20 days.

Prior to March 1, 1965, the reply card contained a space in which the addressee could request delivery of any "similar publication" in the future. A list of the persons thus manifesting a desire to receive "communist political propaganda" was maintained by the Post Office. The Government in its brief informs us that the keeping of this list was terminated, effective March 15, 1965. Thus, under the new practice, a notice is sent and must be returned for each individual piece of mail desired. The only standing instruction which it is now possible to leave with the Post Office is *not* to deliver any "communist po-

---

disorder, civil riot, or other conflict involving the use of force or violence in any other American republic or the overthrow of any government or political subdivision of any other American republic by any means involving the use of force or violence." 22 U. S. C. § 611 (j).

litical propaganda." [2]    And the Solicitor General advises us that the Post Office Department "intends to retain its assumption that those who do not return the card want neither the identified publication nor any similar one arriving subsequently."

No. 491 arose out of the Post Office's detention in 1963 of a copy of the *Peking Review #12* addressed to appellant, Dr. Corliss Lamont, who is engaged in the publishing and distributing of pamphlets.    Lamont did not respond to the notice of detention which was sent to him but instead instituted this suit to enjoin enforcement of the statute, alleging that it infringed his rights under the First and Fifth Amendments.    The Post Office thereupon notified Lamont that it considered his institution of the suit to be an expression of his desire to receive "communist political propaganda" and therefore none of his mail would be detained.    Lamont amended his complaint to challenge on constitutional grounds the placement of his name on the list of those desiring to receive "communist political propaganda."    The majority of the three-judge District Court nonetheless dismissed the complaint as moot, 229 F. Supp. 913, because Lamont would now receive his mail unimpeded.    Insofar as the list was concerned, the majority thought that any legally significant harm to Lamont as a result of being listed was merely a speculative possibility, and so on this score the controversy was not yet ripe for adjudication.    Lamont appealed from the dismissal, and we noted probable jurisdiction.    379 U. S. 926.

Like Lamont, appellee Heilberg in No. 848, when his mail was detained, refused to return the reply card and

---

[2] A Post Office regulation permits a patron to refuse delivery of any piece of mail (39 CFR § 44.1 (a)) or to request in writing a withholding from delivery for a period not to exceed two years of specifically described items of certain mail, including "foreign printed matter." *Ibid.*    And see Schwartz, The Mail Must Not Go Through, 11 U. C. L. A. L. Rev. 805, 847.

instead filed a complaint in the District Court for an injunction against enforcement of the statute. The Post Office reacted to this complaint in the same manner as it had to Lamont's complaint, but the District Court declined to hold that Heilberg's action was thereby mooted. Instead the District Court reached the merits and unanimously held that the statute was unconstitutional under the First Amendment. 236 F. Supp. 405. The Government appealed and we noted probable jurisdiction. 379 U. S. 997.

There is no longer even a colorable question of mootness in these cases, for the new procedure, as described above, requires the postal authorities to send a separate notice for each item as it is received and the addressee to make a separate request for each item. Under the new system, we are told, there can be no list of persons who have manifested a desire to receive "communist political propaganda" and whose mail will therefore go through relatively unimpeded. The Government concedes that the changed procedure entirely precludes any claim of mootness and leaves for our consideration the sole question of the constitutionality of the statute.

We conclude that the Act as construed and applied is unconstitutional because it requires an official act (*viz.*, returning the reply card) as a limitation on the unfettered exercise of the addressee's First Amendment rights. As stated by Mr. Justice Holmes in *Milwaukee Pub. Co.* v. *Burleson,* 255 U. S. 407, 437 (dissenting): "The United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues . . . ." [3]

---

[3] "Whatever may have been the voluntary nature of the postal system in the period of its establishment, it is now the main artery through which the business, social, and personal affairs of the people are conducted and upon which depends in a greater degree than upon

We struck down in *Murdock v. Pennsylvania,* 319 U. S. 105, a flat license tax on the exercise of First Amendment rights. A registration requirement imposed on a labor union organizer before making a speech met the same fate in *Thomas v. Collins,* 323 U. S. 516. A municipal licensing system for those distributing literature was held invalid in *Lovell v. Griffin,* 303 U. S. 444. We recently reviewed in *Harman v. Forssenius,* 380 U. S. 528, an attempt by a State to impose a burden on the exercise of a right under the Twenty-fourth Amendment. There, a registration was required by all federal electors who did not pay the state poll tax. We stated:

> "For federal elections, the poll tax is abolished absolutely as a prerequisite to voting, and no equivalent or milder substitute may be imposed. Any material requirement imposed upon the federal voter solely because of his refusal to waive the constitutional immunity subverts the effectiveness of the Twenty-fourth Amendment and must fall under its ban." *Id.,* p. 542.

Here the Congress—expressly restrained by the First Amendment from "abridging" freedom of speech and of press—is the actor. The Act sets administrative officials astride the flow of mail to inspect it, appraise it, write the addressee about it, and await a response before dispatching the mail. Just as the licensing or taxing authorities in the *Lovell, Thomas,* and *Murdock* cases sought to control the flow of ideas to the public, so here federal agencies regulate the flow of mail. We do not have here, any more than we had in *Hannegan v. Esquire, Inc.,* 327 U. S. 146, any question concerning the extent to which Congress may

---

any other activity of government the promotion of the general welfare." *Pike v. Walker,* 73 App. D. C. 289, 291, 121 F. 2d 37, 39." And see Gellhorn, Individual Freedom and Governmental Restraints, p. 88 *et seq.* (1956).

classify the mail and fix the charges for its carriage. Nor do we reach the question whether the standard here applied could pass constitutional muster. Nor do we deal with the right of Customs to inspect material from abroad for contraband. We rest on the narrow ground that the addressee in order to receive his mail must request in writing that it be delivered. This amounts in our judgment to an unconstitutional abridgment of the addressee's First Amendment rights. The addressee carries an affirmative obligation which we do not think the Government may impose on him. This requirement is almost certain to have a deterrent effect, especially as respects those who have sensitive positions. Their livelihood may be dependent on a security clearance. Public officials, like schoolteachers who have no tenure, might think they would invite disaster if they read what the Federal Government says contains the seeds of treason. Apart from them, any addressee is likely to feel some inhibition in sending for literature which federal officials have condemned as "communist political propaganda." The regime of this Act is at war with the "uninhibited, robust, and wide-open" debate and discussion that are contemplated by the First Amendment. *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270.

We reverse the judgment in No. 491 and affirm that in No. 848.

*It is so ordered.*

MR. JUSTICE WHITE took no part in the consideration or decision of these cases.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE GOLDBERG joins, concurring.

These might be troublesome cases if the addressees predicated their claim for relief upon the First Amendment rights of the senders. To succeed, the addressees

would then have to establish their standing to vindicate the senders' constitutional rights, cf. *Dombrowski* v. *Pfister,* 380 U. S. 479, 486, as well as First Amendment protection for political propaganda prepared and printed abroad by or on behalf of a foreign government, cf. *Johnson* v. *Eisentrager,* 339 U. S. 763, 781–785. However, those questions are not before us, since the addressees assert First Amendment claims in their own right: they contend that the Government is powerless to interfere with the delivery of the material because the First Amendment "necessarily protects the right to receive it." *Martin* v. *City of Struthers,* 319 U. S. 141, 143. Since the decisions today uphold this contention, I join the Court's opinion.

It is true that the First Amendment contains no specific guarantee of access to publications. However, the protection of the Bill of Rights goes beyond the specific guarantees to protect from congressional abridgment those equally fundamental personal rights necessary to make the express guarantees fully meaningful. See, *e. g., Bolling* v. *Sharpe,* 347 U. S. 497; *NAACP* v. *Alabama,* 357 U. S. 449; *Kent* v. *Dulles,* 357 U. S. 116; *Aptheker* v. *Secretary of State,* 378 U. S. 500. I think the right to receive publications is such a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.

Even if we were to accept the characterization of this statute as a regulation not intended to control the content of speech, but only incidentally limiting its unfettered exercise, see *Zemel* v. *Rusk,* 381 U. S. 1, 16–17, we "have consistently held that only a compelling [governmental] interest in the regulation of a subject within [governmental] constitutional power to regulate can jus-

tify limiting First Amendment freedoms." *NAACP* v. *Button,* 371 U. S. 415, 438. The Government's brief expressly disavows any support for this statute "in large public interests such as would be needed to justify a true restriction upon freedom of expression or inquiry." Rather the Government argues that, since an addressee taking the trouble to return the card can receive the publication named in it, only inconvenience and not an abridgment is involved. But inhibition as well as prohibition against the exercise of precious First Amendment rights is a power denied to government. See, *e. g., Freedman* v. *Maryland,* 380 U. S. 51; *Garrison* v. *Louisiana,* 379 U. S. 64; *Speiser* v. *Randall,* 357 U. S. 513. The registration requirement which was struck down in *Thomas* v. *Collins,* 323 U. S. 516, was not appreciably more burdensome. Moreover, the addressee's failure to return this form results in nondelivery not only of the particular publication but also of all similar publications or material. Thus, although the addressee may be content not to receive the particular publication, and hence does not return the card, the consequence is a denial of access to like publications which he may desire to receive. In any event, we cannot sustain an intrusion on First Amendment rights on the ground that the intrusion is only a minor one. As the Court said in *Boyd* v. *United States,* 116 U. S. 616, 635:

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance.

"It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

The Government asserts that Congress enacted the statute in the awareness that Communist political propaganda mailed to addressees in the United States on behalf of foreign governments was often offensive to the recipients and constituted a subsidy to the very governments which bar the dissemination of publications from the United States. But the sensibilities of the unwilling recipient are fully safeguarded by 39 CFR § 44.1 (a) (Supp. 1965) under which the Post Office will honor his request to stop delivery; the statute under consideration, on the other hand, impedes delivery even to a willing addressee. In the area of First Amendment freedoms, government has the duty to confine itself to the least intrusive regulations which are adequate for the purpose. Cf. *Butler* v. *Michigan,* 352 U. S. 380. The argument that the statute is justified by the object of avoiding the subsidization of propaganda of foreign governments which bar American propaganda needs little comment. If the Government wishes to withdraw a subsidy or a privilege, it must do so by means and on terms which do not endanger First Amendment rights. Cf. *Speiser* v. *Randall, supra.* That the governments which originate this propaganda themselves have no equivalent guarantees only highlights the cherished values of our constitutional framework; it can never justify emulating the practice of restrictive régimes in the name of expediency.

Mr. Justice Harlan concurs in the judgment of the Court on the grounds set forth in this concurring opinion.