**Application of COMMERCIAL INVESTMENT CO. Ltd. to vacate a Search Warrant.**

**No. M9–150.**

United States District Court
S. D. New York.

Nov. 12, 1969.

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, for the United States; Frank M. Tuerkheimer, Asst. U. S. Atty., of counsel.

Rogers, Hoge & Hills, New York City, for petitioner; Alfred P. O'Hara, Clendon H. Lee, New York City, of counsel.

OPINION

FRANKEL, District Judge.

The court in this proceeding was asked, by an order to show cause under Fed.R. Crim.P. 41(e), to vacate or otherwise nullify a search warrant which was alleged to have been issued and employed with no semblance of justification under the law governing such process. The

government at first resisted the motion, effectively succeeding in its continued detention of some $3,000,000 worth of securities. Then, on the morning scheduled for its response, the government consented to the motion. If the opinions of inferior courts are ever useful, this is an occasion for writing one despite the consent, with the hope that it may help to prevent future instances of such conduct. Cf. Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed. 2d 398 (1965).

The warrant in question was issued by a commissioner on October 22, 1969. It authorized a daytime search of a brokerage house (Hayden, Stone, Inc., in New York City) where, the warrant recited, various stock and bond certificates "in Account Number AE–0006–189 * * * (Special Omnibus Account) in the name of Commercial Investment Co., Ltd., [hereinafter "CIC,"] * * * Hong Kong, British Crown Colony," were being "concealed." These certificates, the warrant said (worth some $5,000,000, as it later appeared), were "the means and fruits of crimes under" 15 U.S.C. §§ 78c, 78d, 78g and 78j(b), various rules and regulations under those portions of the Securities Exchange Act of 1934, and 18 U.S.C. § 1001. Accordingly, the marshal was commanded to search them out and seize them.

The purported justification for the warrant was supplied by affidavits of two S.E.C. attorneys, both dated, like the resulting warrant, October 22, 1969. One of these affiants, Ira M. Pearce, Esq., gave the basic facts about the alleged crimes being investigated. He reported learning from a Miss Patricia Fulghum, in an interview at the Commission's offices on July 22, 1969, that she had been working in Saigon as a secretary for the Agency for International Development in late 1968 and early 1969; that she had learned there of the brokerage services of CIC; that she came, evidently in early 1969, to send that company a letter and check for the opening of a discretionary account for the purchase of securities, on margin to the extent "deemed advisable" by CIC; and that she said she was ignorant of the pertinent meaning of either "margin" or "discretion." The affidavits developed that Miss Fulghum invested a total of $18,000 in the account, representing her life savings. Over the months in the first half of 1969, her account showed debit balances as high as $28,000, with the average margin moving to points as low as 30%. She was asked from time to time for more margin, but had no more money to invest.

The affidavits point out that Regulation T of the Federal Reserve Board imposes an 80% margin requirement. (Whether this provision can be violated only at the time of a purchase of securities is unclear and not now important.) Although, as has been noted, the affidavits say the market value of Miss Fulghum's securities had from time to time dropped to as low as 30% of her debit balance, it was not shown expressly whether CIC made any margin purchases for Miss Fulghum at times when her account was below the required level. Nor was there any indication of the status of her account at or about the date of the affidavits.

Acting upon the warrant, the marshal proceeded on October 23, 1969, to the offices of Hayden, Stone, inventoried the $5,000,000 or so worth of securities in the CIC account, and effected what has amounted to a "seizure" in a highly effective sense.[1] On the following day,

---

1. Our analysis, intentionally but harmlessly, turns a little vague at this point. The motion of CIC, it will be recalled, was to "vacate" the warrant. If the property had been "seized" in a standard way, the motion could have been couched in the usual terms—to "return" and "suppress for use as evidence"—of Rule 41(e). But the forms of words, and the precise character of the "seizure" (or whether there was one), are not vital. The parties agreed that the motion, however styled, fairly raised the question whether the warrant was lawful or unlawful.

the United States Attorney's office issued a press release to tell of the action. On the day after that, Hayden, Stone and the United States Attorney, accepting the view of the New York Stock Exchange on the effect of the warrant, agreed that the securities in the CIC account "could no longer constitute good collateral for the debit balance in that account." Upon a Hayden, Stone affidavit so reciting, upon the further statement that CIC's indebtedness to Hayden, Stone was $2,195,000, and with the consent of the United States Attorney, the commissioner amended the warrant to allow Hayden, Stone to liquidate enough of the "means and fruits" in the account (not specifically identified or limited) to cover the indebtedness. We are told that Hayden, Stone then wired CIC demanding the deposit of $2,195,000 by 10 a. m. on October 27, 1969; that the deposit was not made; and that some $2,000,000 worth of the securities in the CIC account were thereupon liquidated.

Moving with the speed obviously dictated by the circumstances, CIC retained counsel, who first sought voluntary vacatur of the warrant by the United States Attorney. When that effort failed, the present motion was brought, returnable November 7. The Assistant United States Attorney orally defended what amounted to seizure of CIC's account on the ground that it contained "fruits" of crime. The court allowed an intervening weekend for preparation of a memorandum in support of that position. The result, instead, has been consent to the motion.

As reflected in the government's changed position, the justification for the search warrant was never substantial. The theory of the affidavits, accepted by the commissioner, appears to have been that (1) there was probable cause for believing CIC had perpetrated crimes affecting Miss Fulghum's $18,000

investment, and (2) the $5,000,000 account held by Hayden, Stone as clearing broker could properly be seized as "the means and fruits" of such crimes. Those were at first blush bizarre and terrifying propositions. They have not improved upon additional study.[2]

The governing words and principles are, of course, those of the Fourth Amendment. The right asserted is against "unreasonable searches and seizures * * *." The purported authority of a warrant may prevail against the claims of privacy only if the test is met of "particularly describing * * * the * * * things to be seized." There is no need here to review the familiar history of that protection against the hated former regime of "searches under indiscriminate, general authority." Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 301, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). It is enough to recall the bedrock principles and identify the violations here in question.

The propriety of searches for "fruits" and "instrumentalities" of crime is clear. It is equally clear, however, that the quoted words must be read sensibly, with a view to their context of fundamental rights. Here, the sweep of the warrant exceeded all plausibly arguable bounds. As to anything seized, with or without a warrant, "[t]here must, of course, be a nexus * * * between the item to be seized and criminal behavior." Warden v. Hayden, *supra* at 307, 87 S.Ct. at 1650. Even that elementary requirement was not met by the warrant in this case except on the untenable theory that everything involved in a business operation, where criminal activity is believed to have occurred, becomes on that score subject to seizure.

The conception of the "fruits" of a crime seems clear enough—as, e. g., stolen property, Boyd v. United States,

---

2. Because the "means and fruits" theory of the warrant was so clearly baseless, the court found no need to dwell upon the more customary question of whether there was sufficient showing of probable cause to believe that the alleged crimes in question had been committed. It may be observed in passing, however, that CIC mounted powerful arguments on this pretermitted subject.

116 U.S. 616, 623–624, 6 S.Ct. 524, 29 L.Ed. 746 (1886), or the proceeds of an illegal sale, United States v. Dornblut, 261 F.2d 949 (2d Cir. 1958), cert. denied, 360 U.S. 912, 79 S.Ct. 1298, 3 L.Ed.2d 1262 (1959)—and clearly enough removed from the present picture.

■ The attempt to treat the whole account as an "instrumentality," or collection of "instrumentalities," is not more impressive. The concept in its setting relates to things that are at the very least "used to carry on the criminal enterprise." Marron v. United States, 275 U.S. 192, 199, 48 S.Ct. 74, 77, 72 L.Ed. 231 (1927); Abel v. United States, 362 U.S. 217, 237, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); Harris v. United States, 331 U.S. 145, 148, 154, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). It was never better than absurd to suggest that the entire portfolio of CIC, containing $5,000,000 in securities, was "part of the * * * equipment actually used to commit the offense," Marron v. United States, supra at 199, 48 S.Ct. at 77, where the wrongs alleged consisted of possible improprieties affecting an $18,000 brokerage account.

The relationship between the violation alleged and the "means" seized was at best remote, if not non-existent. It did not approach, for example, the arguable claim of "nexus" in Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed. 2d 876 (1957), which held that an array of paraphernalia for sleeping, eating and living in a hideaway had been unlawfully seized in connection with an arrest for conspiring to aid and comfort a fugitive. The prohibition of seizures of articles in bulk, among which may be things utilized to a greater or lesser degree in the commission of crime, is at the very heart of the Fourth Amendment. United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775 (1932); Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

Apart from the factor of gross overkill, the characterization of the stock certificates as "means" or "instrumentalities" was unsupportable. There is a sense, of course, in which almost anything could be an "instrumentality" once we shook the fetters of sense and constitutional law—like, for example, the plant and assets of a company allegedly involved in antitrust violations. However, as Judge Bryan put it in United States v. Stern, 225 F.Supp. 187, 192 (S.D.N.Y. 1964):

"Not every article that plays some part in the commission of the alleged crime is a means of committing it in this sense. Although it is not necessary that the crime could not have been committed but for the use of the article seized, after a consideration of all the circumstances it must appear that the article played a *significant* role in the commission of the crime alleged."

The seizure in the present case could not begin to meet the test. If relevant at all to the alleged violations, the securities in the account were at most incidental. None of the certificates held by Hayden, Stone (not even the relatively paltry number that could conceivably have related in some way to Miss Fulghum) was in any sense a "vital factor" in the alleged criminal enterprise. United States v. Lindenfeld, 142 F.2d 829, 832 (2d Cir.), cert. denied, 323 U.S. 761, 65 S.Ct. 89, 89 L.Ed. 609 (1944).

It is not surprising, in sum, that the government should have acknowledged by its "consent" the impropriety of what was done in this case. It may be, and it is, assumed that the action now condemned was taken in the profoundest good faith. This, obviously, can make no essential difference. If officials' certainty of their own righteousness were an adequate safeguard for our liberties, the Bill of Rights would be largely superfluous. The preverted forms of a "search" in this case worked a lawless result that ought never to be repeated.