**Al GOLDSTEIN and Media Ranch, Inc., Plaintiffs,**

v.

**MANHATTAN CABLE TELEVISION, INC., The City of New York, William Squadron, Defendants.**

**No. 90 Civ. 4750 (LBS).**

United States District Court, S.D. New York.

Sept. 20, 1995.

Norwick & Schad, New York City (Kenneth P. Norwick, of counsel), Goldbergh & Spitzer, New York City (Vlad G. Spitzer, of counsel), New York Civil Liberties Union Foundation, New York City (Arthur Eisenberg, Marjorie Heins, of counsel), for Plaintiffs.

Cravath, Swaine & Moore, New York City (Stuart W. Gold, Marc E. Ackerman, Rebecca L. Cutler, of counsel), for Defendant Time Warner Cable of New York City.

Matthew E. Fishbein, Acting United States Attorney for the Southern District of New York, New York City (William J. Hoffman, Asst. U.S. Attorney, of counsel), Intervenor.

SAND, District Judge.

Plaintiffs Media Ranch, Al Goldstein, Kee–Byrd Productions, Robin Byrd, Gay Cable Network, and Lou Malleta produce programs designed to be televised over cable television systems. Defendant Time Warner Cable of New York City transmits cable television programming pursuant to a franchise granted in 1990 to its predecessor in interest, Manhattan Cable Television, by Defendant The City of New York. Defendant Thomas Dunleavy is the Deputy Commissioner of the New York City Department of telecommunications and Cable Television. Before this Court is a motion by Plaintiffs for a preliminary injunction to prohibit Time Warner Cable of New York City from scrambling plain-

tiffs' programming.[1] For the reasons set forth below, we grant the motion.

## BACKGROUND

This case, when originally commenced in 1990, rested principally on the 1984 Cable Act. The original plaintiffs, Media Ranch and Al Goldstein produce a late-night, sexually oriented program entitled "Midnight Blue" that is cablecast on Defendant Time Warner Cable of New York City's leased access Channel 35. Midnight Blue is a magazine-type program devoted to providing adult entertainment and feature programs on both sexual and non-sexual issues. Al Goldstein and Media Ranch challenged Manhattan Cable's (Time Warner's predecessor in interest) practice of pre-screening the content of "Midnight Blue" and the resulting instances where the pre-screening led to Manhattan Cable's refusal to cablecast portions of the program. Plaintiffs further contended that the pre-screening practice violated New York Executive Law § 829 which prohibits cable television companies from censoring any program presented over a leased access channel. Upon these claims, plaintiffs moved for summary judgment in November 1991. Defendants cross-moved for summary judgment.

While these motions were *sub judice,* Congress enacted the 1992 Cable Act which directly affected the degree of editorial control a cable operator could exercise over its leased access programming. Section 10 of the 1992 Cable Act amended § 612(h) of the 1984 Cable Act by allowing cable operators to censor indecent programming based upon the content of the programming. § 10(a) provides:

> This subsection shall permit a cable operator to enforce prospectively a written and published policy of prohibiting programming that the cable operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards.

Section 10(b) directed the Federal Communications Commission to promulgate "regulations designed to limit the access of children to indecent programming" for cable operators who did not prohibit indecent programming under § 10(a). § 10(b) contains three government directives. First, it requires cable operators to place all indecent programs (as identified by the program providers) on a single channel. Second, it requires cable operators to block the single channel unless the subscriber requests access to the channel in writing. Third, § 10(b) requires programmers to inform cable operators if the program would be indecent as defined by Commission regulations.

Petitions for review challenging the constitutionality of § 10 were submitted to the United States Court of Appeals for the District of Columbia Circuit in February 1993. In the spring of 1993, the D.C. Circuit stayed § 10 pending disposition of the petitions. *Alliance for Community Media v. FCC,* Nos. 93–1169 and 93–1171 (D.C.Cir. April 7, 1993); *Alliance for Community Media v. FCC,* Nos. 93–1270 and 93–1276 (D.C.Cir. May 7, 1993). On November 23, 1993, a panel of the D.C. Circuit held that the provision of § 10(a) that authorized cable companies to ban completely indecent programming from leased access channels violated the First Amendment. The panel further held that § 10(b)'s segregation and blocking regulations were impermissibly under-inclusive. *Alliance for Community Media v. FCC,* 10 F.3d 812 (D.C.Cir. 1993).

Thereafter, the Court of Appeals sitting *en banc,* vacated the panel's judgment. On June 6, 1995, a divided Court held that any censorship under § 10(a) was entirely voluntary, without coercion, significant encouragement or joint participation by the federal government and therefore, no state action was present upon which to ground a constitutional claim. The Court also upheld the constitutionality of § 10(b) finding its directives narrowly tailored to further a compelling government interest. On July 10, 1995 the Court of Appeals stayed its mandate pending

---

1. Various other motions relating to intervention and the filing of an amended complaint were granted during oral argument on September 18, 1995. *See* transcript. The City of New York moved orally for its dismissal from these proceedings and the Court reserved decision on that motion and it is not addressed here.

the filing of petitions for writs of certiorari in the Supreme Court. By August 9, 1995, all *Alliance* petitioners had filed their certiorari petitions. The Government papers are expected to be submitted during this coming October 1995. *Alliance for Community Media v. FCC,* 56 F.3d 105, 117 (D.C.Cir.), *petition for cert. filed,* 64 U.S.L.W. 3104 (N.D.Cal.1995) (No. 95–227).

By agreement among counsel in the original *Al Goldstein and Media Ranch v. Manhattan Cable Television, et al.* case, and with the approval of this Court, the cross-motions for summary judgment that were pending prior to the enactment of the 1992 Act were withdrawn and further litigation of the action was held in abeyance pending the decision of the D.C. Circuit Court.

After the D.C. Circuit's *en banc* decision upholding the constitutionality of § 10, Time Warner announced on July 17, 1995 that it will institute a new indecency policy. Commencing October 1, 1995, Time Warner will scramble the signal of leased access programming that it considers indecent. *See* Plaintiff's Order to Show Cause for a Temporary Restraining Order, Exhibit B. Scrambling will occur even though the "indecent programs" are scheduled for viewing only "during late-night and overnight hours." Access to such "indecent programming" may only be gained by submitting a written request containing a statement that the viewer is the cable subscriber and is at least 18 years old.

Citing constitutionality concerns over Time Warner's Scrambling policy, § 10's impact upon that policy, and its direct conflict with New York Executive Law § 829, plaintiffs have petitioned this Court for a preliminary injunction to maintain the status quo and to enjoin the implementation of Time Warner's scrambling policy pending the Supreme Court's action with respect to the certiorari petitions.

**2.** *Alliance* came before the Court on petitions for review of two orders of the F.C.C. and did not present any questions of injunctive relief.

**3.** Issuance of a stay reflects that Court's conclusion that "substantial questions" of constitutional law are presented. *See* F.R.A.P. 41(b); D.C.Cir.

## DISCUSSION

We find the questions posed by this motion to be close and complex. The Court of Appeals for the District of Columbia, sitting *en banc* and having the benefit of a prior panel opinion, took eight months from the time of oral argument before deciding the *Alliance* case.[2] The *Alliance* Court split four to seven, wrote four opinions, and ultimately concluded that the constitutional issues before it were so close and of such magnitude that it stayed its mandate pending action by the Supreme Court on the certiorari opinions filed in the *Alliance*[3] case and stayed as well the F.C.C. regulations adopted pursuant to the statute.

This Court has been given only since September 18th, when it heard over four hours of oral argument, receiving briefs and affidavits as late as September 19th, in which to consider this motion. Moreover, circumstances compel a virtually immediate decision by this Court if the parties are to be afforded an opportunity to seek appellate review[4] and to advise the 290,000 subscribers to Time Warner's cable service of what will, in fact, occur by the October 1st date unilaterally and arbitrarily set by that company.

We do not purport, in that narrow time frame, to have determined definitely what should be the ultimate resolution on the merits of the several questions posed. Although the decision which we now announce represents the conscientious views of this Court after intensive study of the question, it does not and cannot reflect the serious scholarship and contemplation which the questions raised warrant.

In reaching our conclusion, we recognize the various conflicting considerations which are operative here. These include the presumption which exists in favor of the constitutionality of the statute, the deference which this Court must pay to the Federal Communication Commission's interpretation of the statute upon which Time Warner so heavily

Rule 41(a)(2). *Stern & Gressman, Supreme Court Practice,* 674 (7th ed. 1993).

**4.** The Court of Appeals does not sit on September 25, 1995.

relies, the fact that preliminary injunctive relief is an extraordinary remedy and that where, as here, issues affecting the public interest are presented, parties seeking such relief must satisfy a heavier burden. At the same time, we take into consideration that the serious and substantial claims raised by the plaintiffs relate to First Amendment rights and that such claims are granted special care and consideration by the Courts.

Balancing all of these factors, we find that the balance is tilted in favor of the movants. This conclusion is bolstered by the fact that Time Warner itself stipulated with the principal movant herein not to change voluntarily the terms and conditions upon which it carried "Midnight Blue" without further order of the Court. Time Warner neither sought nor obtained such further order prior to announcing and implementing its proposed actions. Yet, independent of the issues arising by virtue of the stipulation, we believe that the plaintiff has satisfied the greater burden of persuasion necessary for injunctive relief which affects the public interest. *Medical Society of the State of New York v. Toia*, 560 F.2d 535 (2d Cir.1977).

In light of the time restraints and the extensive exposition of the constitutional issues in *Alliance*, we refrain from a detailed discussion of the merits of those issues here. Suffice it to say, we find that for the reasons set forth in the dissenting opinion of Judge Wald in *Alliance*, plaintiff has demonstrated a likelihood of success of the merits. We limit our discussion at this point to two respects in which plaintiff's case differs and, we believe, is stronger than that of the petitioners in *Alliance*.

Time Warner takes the position that it purports to act solely pursuant to § 10(a) which gives the cable operator permission to enforce a policy of prohibiting programming from its leased accessed channels and that this action is independent of the scrambling requirements contained in § 10(b). Indeed, Time Warner's proposed action does not comply with § 10(b) in that Time Warner itself rather than the programmer determines in the first instance whether the program is indecent. Time Warner, with support from the FCC and the United States,

takes the position that since the Supreme Court has said in *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 345–346, 106 S.Ct. 2968, 2979, 92 L.Ed.2d 266 (1986) that the power to ban casino gambling necessarily includes the lesser power to ban casino advertising, the power to ban indecent programs, pursuant to § 10(a), includes the power to carry the programming, subject to conditions other than those contained in § 10(b). Although under *Chevron, USA, Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we give great deference to the views of the FCC, we have difficulty in accepting the proposition that § 10(b) can be rendered totally inoperative by the expedient of the cable operator saying in essence: "We will not carry the indecent programs except we will carry the programs under the following conditions which we have unilaterally determined and which may be more or less restrictive than those called for by § 10(b)." Indeed, Time Warner claims that this is what Congress intended. That assertion is not supported by the language or legislative history of the statute.

Although Time Warner takes the position, as we have just stated, that it is not bound by § 10(b) or the stayed FCC regulations thereunder, it acknowledges that its proposed practices are so close to the § 10(b) requirements that it believes the FCC would find them acceptable if those regulations become effective. One respect in which Time Warner's proposed procedures follow those of § 10(b) is that it requires scrambling unless the subscriber affirmatively requests that the programs not be scrambled. Thus, the consequence of inertia or the failure to receive the reply card is that scrambling results.

In *Alliance*, as the majority explicitly noted, 56 F.3d 105 at 127, fn. 23, no claim was advanced that persons would refrain from affirmatively requesting the programming for fear of stigmatization. But precisely that claim is strenuously raised here, especially on behalf of those whose programs are targeted to gay and lesbian audiences. Indeed, at oral argument, plaintiff's counsel asserted that there might well be no objection raised to a procedure in which scrambling took

place as the result of a mailing of a reply card rather than the failure to mail such a card.

We do not decide the "stigmatization issue" here but content ourselves with noting that it is a serious claim, which makes plaintiff's overall likelihood of success on the merits stronger than if its claims were limited to those raised in *Alliance*. Cf. *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (holding unconstitutional a statute which required the Postmaster not to deliver mail which was "communist political propaganda" unless the addressee returned a card requesting its delivery. Under postal regulations, any request to stop delivery of such mail would be honored). We note again that *Alliance* involved petitions to review and that the *Alliance* court was not faced with, and made no determination, respecting the appropriateness of injunctive relief pending Supreme Court action on the pending certiorari petitions.

We turn now to the "stipulation issue."

The litigation before this Court has been pending since 1990. The parties agreed, and the Court accepted their agreement, that this case should be held in abeyance pending the resolution by the Court of Appeals for the District of Columbia of the closely related issues presented in the *Alliance* case. From time to time, this Court has raised with the parties the question whether this case should not be dismissed because it served no purpose independent of the *Alliance* case, but at the urging of both parties, the case has been kept on the Court's docket, though dormant, and there is no question that the Court has jurisdiction over these motions.

To regulate their relationship during this hiatus, the parties entered into a stipulation which was submitted to the Court and "So Ordered" on November 30, 1990. That stipulation read in pertinent part:

10. The parties will conduct themselves consistent with their prior course of dealing.

11. Defendant will cablecast "Midnight Blue" on its cable system on an interim basis until this Court renders a final judgment on plaintiff's claims, . . .

In 1992, Congress passed the legislation at issue here and in *Alliance*. Time Warner claims that the action which it proposes to take is entirely voluntary on its part and acknowledges that it was free to take the proposed action at any time since the effective date of the statute in 1992.

Time Warner, however, took no such action until August of this year because, consistent with the views expressed to this Court and the understandings which motivated the stipulation, the parties awaited the outcome of the *Alliance* case.

But the *Alliance* case has not been resolved. The Court of Appeals for the D.C. Circuit has stayed its mandate and petitions for certiorari are pending. The D.C. Circuit has itself recognized the tentativeness of its decision. *See* p. 5, fn. 3 *supra*.

The *en banc* decision in *Alliance* was announced on June 6, 1995. After conferences among counsel for the parties, Time Warner on August 1, 1995, advised plaintiffs that it would not accede to their request that it withhold action pending the Supreme Court's action with respect to the pending certiorari petitions although such action is expected to take place within the next month or so. Time Warner immediately embarked on the mailing of 290,000 notices and reply cards to its subscribers. It did so, however, with the knowledge that this motion would be made.

Time Warner did not seek any order from this Court relieving it from the terms of its 1990 stipulation prior to its announcement of its proposed actions and the mailing of the 290,000 cards. We find unpersuasive Time Warner's contention that it did not believe the proposed scrambling of "Midnight Blue" would be in violation of the stipulation and order. This argument is predicated on changes that had been made with respect to the channel on which the program was carried *before* the stipulation was executed.

Both parties to the stipulation wanted assurance that without further order of the Court, presumably to be sought after *Alliance* was definitely resolved, the status quo would be maintained.

We emphasize that this is not an instance in which a change of law frustrates the parties' intent or renders adherence to a prior court order illegal or more onerous. The principal thrust of Time Warner's claim on the merits is the voluntary nature of the action which it proposes. We repeat that there is no special significance to the October 1st date which Time Warner has selected to commence scrambling. Indeed, as was discussed at oral argument, there are a number of significant problems arising by virtue of the selection of that date, including the fact that many of Time Warner's subscribers were away on vacation when the notice and reply cards were mailed. (Scrambling will occur, according to Time Warner's plans, whenever a card requesting continued unscrambled receipt of the programming is not returned. Thus, the consequence of not receiving and responding to the card is that scrambling occurs.)

Surely, the Court is aware of Time Warner's strong interest in demonstrating to those in government and elsewhere who have decried the availability of "indecent programming" on home cable sets, that it is doing all that it can do to address the problem. And it is clearly more convenient to point to the federal courts rather than elsewhere for the reason why more immediate action is not taken. Nevertheless, we find no basis for Time Warner to disregard unilaterally the terms of the agreement it itself sought and into which it entered.

At oral argument, counsel for Time Warner in essence sought for the first time to be relieved from the stipulation. In an affirmation of Stuart W. Gold, Esq., counsel for defendant dated September 19, 1995 and received in Chambers late in the afternoon that day, Time Warner applied to the Court to amend the 1990 Order. In the covering letter of Mr. Gold accompanying that affirmation, he states: "If the Court believes that defendant should submit a formal motion on notice on this issue, we are prepared to do so."

We decline to entertain the informal application to be relieved of the stipulation at this time and in this procedural context. If and when such application is formally made to the Court, consideration can be given, not under the self-imposed time pressures Time Warner has created, to the merits of such application, giving full weight to such factors as the underlying purposes of the stipulation, the imminence of Supreme Court action, and other relevant factors.

We turn now to the circumstance that the stipulation discussed above relates only to "Midnight Blue" and that Time Warner proposes to scramble all "indecent programming" including programs produced by entities not party to that stipulation. We were advised at oral argument that similarly worded stipulations were entered into with other program producers but they are not in the record in this case and the motion presently before the Court relies only on the single stipulation cited above.[5] We were also advised by counsel for Time Warner that if this Court were to grant the motion solely as to "Midnight Blue", it would broadcast that program unscrambled and would scramble all others. We find this to be an extremely difficult position for Time Warner to maintain.

First, Time Warner has often and vigorously cited "Midnight Blue" to be the prime example of outrageous indecent programming. *See, e.g., Alliance for Community Media v. FCC,* 56 F.3d at 117. To continue to carry this program unscrambled and to scramble other less indecent programs would be inequitable and confusing.

Second, Time Warner would be compelled to notify its subscribers that contrary to the previous announcement which had been mailed to them, this one, most "indecent," program would not be scrambled. Thus, all of the costs and alleged adverse consequences of a deviation from Time Warner's prior announcement would be present whether one program or all were transmitted in unscrambled fashion. And the need for parental monitoring, if any, of what programs

---

**5.** The reason why this position was being taken was not made explicit. We note, however, that the several programmers are in competition and that their interests and arrangements with counsel may differ.

children watch in the late hours of the night would continue to be required so long as "Midnight Blue" was carried unscrambled. In the September 19th affirmation of Mr. Gold, the problems of scrambling all indecent programming except "Midnight Blue" are further explicated:

> Moreover, subscribers who do not want to receive plaintiff's indecent programming, including those who are parents, will have to use the locking device in their converter to program out Channel 35 during the hour on Saturday and the hour on Monday when "Midnight Blue" is cablecast. Since the converter locking mechanism only locks out the entire channel, and cannot be programmed to switch on or off by the hour, subscribers who want to watch other programming on Channel 35, but do not want to receive plaintiff's indecent programming, will have to continuously program and reprogram the converter.

For these reasons, we believe that all movants, not merely the producers of "Midnight Blue," should receive like treatment on this motion.

We next address the question whether movant has shown irreparable injury, and note Time Warner's contention that its proposed scrambling will not result in harm to the plaintiff because over 50,000 subscribers have requested unrestricted access to plaintiff's programming. As a consequence, Time Warner contends it is "highly unlikely that plaintiff will suffer any loss of viewers or advertising revenue as a result of implementation of the policy." Affirmation of Stuart W. Gold, Esq., para. 5. We think, for the purposes of this motion, plaintiff has demonstrated a sufficient potential for sustaining irreparable injury when it shows that its maximum audience would be diminished from 290,000 to 50,000.

Time Warner's claim that no such injury would result is predicated on the assumption that all of the 50,000 who returned the card would, in fact watch, and its judgments as to advertisers' positive response to an audience which has gone to the trouble of requesting that the programming be received. Plaintiffs have submitted an affidavit from an advertiser asserting that he would discontinue advertising if scrambling will occur. Declaration of Ben Levine, Sept. 14, 1995. We accord scant weight to this declaration. Mr. Levine is both an advertiser and a program producer. More importantly, we note that this controversy is not so much *whether* there will be scrambling of indecent programs but the terms and conditions upon which such scrambling will take place, and as to which subscribers the programs will be scrambled. But we believe that in the context of the free speech claims raised herein, plaintiffs have sustained their burden of showing both a likelihood of success on the merits and irreparable injury.

We have alerted the Clerk of the Court of Appeals to the fact that an emergency application may be made to that Court for appellate review of this determination.

We will hear the parties with respect to a bond at a hearing on September 20, 1995.

In sum, we conclude that Time Warner may not voluntarily scramble plaintiff's programs at this time because, among other reasons, Time Warner has previously committed itself not to alter its carrying of plaintiff's programs prior to events which have not yet transpired.

Motion Granted.

So Ordered.